# EXHIBIT B

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE


 * * * * * * * * * * * *

  JOHN POWERS,                    *

            Plaintiff,      *

  vs.                        * Civil Action

 TOWN OF DURHAM,            * No. 1:23-CV-00327-SM

            Defendant.      *

   * * * * * * * * * * * *



        ZOOM VIDEO RECORDED DEPOSITION OF

                **DAVID F. EMANUEL**

             Durham, New Hampshire

          January 10, 2025     9:07 a.m.



        Maryellen Coughlin, CSR/RPR/CRR

2

**APPEARANCES:**

Representing the Plaintiff:

   DICKINSON & SILVERMAN, PLLC

   63 Pleasant Street

   Hooksett, New Hampshire 03103

   BY:  Gregory L. Silverman, Esq.

   603-724-8089

   Greg@silverman-law.com


Representing the Defendant:

   JACKSON LEWIS LLP

   100 International Drive

   Portsmouth, New Hampshire 03801

   BY:  Samuel H. Martin, Esq.

   603-559-2700

   Samuel.martin@jacksonlewis.com


Present:  John Powers

3

**I N D E X**


**DAVID F. EMANUEL**

EXAMINATIONS                                              PAGE

  BY MR. SILVERMAN                                           6


                        **E X H I B I T S**

   NO.             DESCRIPTION                   PAGE

   1      Plaintiff's First Amended               8

          Notice of Deposition of

          Defendant

   2      John Powers, Town of Durham            26

          Employment Timeline (RESP

          000172)

   3      4/13/18 letter to Fire Chief           47

          David F. Emanuel from John

          T. Powers, Jr.

   4      1/17/20 email chain,                   111

          Subject:  Re:  Intermittent

          Telephone Communication Line

          Problem - Friday Updates

          (DEF 2252 - 54)

4

## **EXHIBITS CONTINUED**

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 5 | 2/3/20 email, Subject: DFD Annual Coaching - Employee Input Form | 116 |
| 6 | 1/29/20 email, Subject: Re: 2019 Annual Self-Evaluations | 118 |
| 7 | 2/14 20 email, Subject Insights Assessment/DISC Assessment from Primex | 124 |
| 8 | 2/26/20 email, Subject: Chief's Roundtable - Coordination | 128 |
| 9 | 2/20/2020 memo to the File from Dave Emanuel | 132 |
| 10 | 2/27/10 email, Subject: Chiefs Meeting | 156 |
| 11 | Meeting Notes: Follow up log, RE: Expectations and Performance Improvement Plan for Powers, March 2, 2020 | 200 |

5

**EXHIBITS CONTINUED**

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 12 | Text messages with Todd Selig | 205 |
| 13 | 3/10/20 letter to Jill Durand, Psy.D. from David Emanuel with Attachments | 217 |
| 14 | Emails (DEF 499 - 501) | 220 |
| 15 | 3/19/2020 termination letter | 234 |

6

**P R O C E E D I N G S**

MR. SILVERMAN:  Good morning, Mr. Emanuel.

THE WITNESS:  Good morning, Mr. Silverman.

MR. SILVERMAN:  My name is Greg Silverman.  I am counsel for the plaintiff, John Powers, in this matter.

Oh, Maryellen, can you swear in the witness, please.

**DAVID F. EMANUEL,**

having been first duly sworn, was examined and testified as follows:

**EXAMINATION**

**BY MR. SILVERMAN:**

Q.    Mr. Emanuel, have you ever been deposed before?

A.    Yes.

Q.    Under what circumstances?

A.    Well, the Human Rights Commission did a deposition a few months ago on this -- on a remarkably similar case involving Mr. Powers, and I was deposed for -- I don't know if it was

7

actually a deposition or not but we -- I went to court for an engineering case at one point in time, and probably 20 years ago, as an expert witness.

Q.    So just to clarify, you testified with the Human Rights Commission concerning this case, for this case with Mr. Powers?

A.    A case with Mr. Powers, that's correct.

Q.    Thank you.  And the other time you testified was as an expert in an engineering matter in court; is that right?

A.    That's correct.

Q.    Okay.  So just some ground rules. Your testimony here is the same kind of testimony under oath that you would provide in court.  I'm going to ask you to listen carefully to my questions, and then you provide as full, accurate and truthful a response as you can.  If you don't understand my question, please let me know, and I'll do my best to repeat, rephrase.  And if you answer, I'll assume you understood the question. Okay?

8

A.        Yes.

Q.        Any time you need a break, please let me know.  If there's a pending question, I'll ask that you answer it, but otherwise, my plan is to take breaks about every hour.  And is there any reason you're aware of that you can't provide truthful and accurate testimony today?

A.        There is not.

(Whereupon, Deposition Exhibit 1, Plaintiff's First Amended Notice of Deposition of Defendant, was marked for identification.)

**BY MR. SILVERMAN:**

Q.        Okay.  All right, Mr. Emanuel, I've shared my screen.  It's a document I've marked as Exhibit 1, and I'll represent that this is the notice of deposition.  Have you seen this before? I'll scroll down.

A.        Yes.  That's taken a day I just -- yes.

Q.        And so I understand the town has designated you to testify on its behalf today. Is that correct?

9

A.      Yes.

Q.      Okay.  And you have full authority to speak on behalf of the town; is that correct?

A.      Yes.

Q.      Thank you.  And, Mr. Emanuel, what did you do to prepare for this deposition today?

A.      I met with Attorney Martin just to review the documents like --

Q.      Okay.  Without telling me what you and him discussed, what documents did you review?

A.      A handful of documents that are similar to what you're showing me right now and a set of memos and notes and letters that were all moving at the time of the -- early 2020.

Q.      Thank you.  So, Mr. Emanuel, I want to go to, let's see, topic number 1 of Exhibit 1, the number of town employees on its payroll in 2020.  Do you know how many town employees were on the payroll in 2020?

A.      I believe right around a hundred.

Q.      Was it -- let me ask you.  Was it more than a hundred, less than a hundred?

A.      I can't verify that.  You know,

10

Greg, I looked it up in the town report in the budget area, and it was challenging to determine whether they were career employees or part-time employees.  It was in the hundred range.

Q.    Thank you.  I want to move on to topic number 2 which is the town's organizational structure from the plaintiff's job title he once held with the town through the town's fire department chief and town administrator.  Do you see that?

A.    I do.  Yeah, thank you for highlighting it.

Q.    Okay.  So my understanding is that in 2020 you were the chief of the Durham Fire Department, correct?

A.    That is correct.

Q.    And was your immediate supervisor Town Administrator Todd Selig?

A.    That is correct.

Q.    Okay.  Did you have any other supervisors you reported to?

A.    No.

Q.    Okay.  Below you there were deputy

11

chiefs, correct?

A.    One assistant chief and one deputy chief, yes.

Q.    Okay.  Mr. Trull was the assistant chief; is that correct?

A.    That is correct.

Q.    Okay.  And Mr. Powers was the deputy chief?

A.    Yes.

Q.    And then was there any other deputy or assistant chiefs?

A.    No.

Q.    Mr. Powers was the head of the department's prevention office; is that correct?

A.    Yes.

Q.    Okay.  And is the head of prevention always a deputy chief?

A.    No.  It's --

Q.    Okay.  When -- yeah, go ahead. When would a head of prevention not be a deputy chief?

A.    Ooh.  One or two people before John.  We went from just having inspectors to

12

having a chief level officer oversee that division.

Q.    So it was possible that the head of prevention would not be a deputy chief under certain circumstances?

A.    When it was a single inspector, we just had an inspector.  When we started to have inspectors that needed to report to someone, we went with a deputy chief model, yes.

Q.    And when John was working for the department in 2020, there were inspectors who reported to him?

A.    Yes.

Q.    How many?

A.    Two.

Q.    And what were their names?

A.    Matt Wilder.  A Matthew Wilder and Jessica Plante.

Q.    Did Mr. Powers have any other employees who reported to him?

A.    Not directly, no.

Q.    All right.  Mr. Emanuel, I'm going to focus your attention to topic number 3, the

13

qualifications, training and supervision of David Emmanuel and Todd Selig.  My question is for you personally.  Can you tell me about your educational background?

A.    Where would you like me to start?

Q.    Let's start with college.

A.    College.  I attended the University of New Hampshire from 1990 to 1997, and I earned dual degrees in business administration and civil engineering, and I went on to do a master's in public administration also here at UNH around 2014, or finished in '14.  So I'm a wildcat, Greg, through and through.

Q.    Go wildcats.  After you graduated from UNH, what did you do for employment?

A.    It's a great question.  I finished UNH in May, and I went to work for the family engineering company as an engineer, and in September we had a vacancy here at the Durham Fire Department, and I had been a part-time firefighter here for my entire college career, and I took a position here as a firefighter in 1997.

14

Q.      What was your title when you started with the department?

A.      Oh, a call firefighter when I started with the fire department, 1991.

Q.      Okay.  And can you give me a summary of kind of how you worked your way up in the department?

A.      Yes.  I was a bright-eyed, bushy tailed college kid who came from a volunteer fire department at home, and I was active on the call company throughout my college years, serving most of them serving as the president and the coordinator of the call company.  I participated in the department training as robustly as I could.  I participated in all the training I could.  They offered me a job a number of times. The fire chief would always counsel me not to take the job until I had finished my schooling. So the first opportunity after I graduated from UNH, we had a candid conversation, and I accepted a job here as a firefighter EMT in September of 1997.

Q.      And so you started off as a

15

firefighter.  When did you earn a higher title than just a line firefighter?

A.      I served -- I guess that depends whatever we're calling titles.  I served in positions all over the association, the Durham Professional Firefighters Association.  I think as soon as I got off probation they put me in an executive board position.  So I've served as a secretary, vice president, president of the firefighters association throughout my career as a firefighter, and I was promoted to the rank of captain in 2008.

Q.      Thank you.  What was -- so you were captain in 2008, and then when did you become chief?

A.      I became chief in 2018.

Q.      Did you hold any different titles from when you became assistant chief in 2008 to when you became chief?

A.      Yes.  I was a captain in 2008.  In 2015, I became the assistant chief.  So I served as the assistant chief of the fire department until I was promoted in 2018.

16

Q.      Mr. Emanuel, have you ever received training on how to manage a fire department or how to manage fire department employees as chief?

A.      I have.

Q.      Tell me what that involves.

A.      I'm not sure I understand the question.

Q.      Sure.  I'm just interested -- you said you received training on managing employees as chief, and I'm interested in what kind of training you received.

A.      Well, I went back to school and picked up a master's in public administration with a focus on leadership and employee management, and I attended the National Fire Academy, the Executive Fire Officer Program, to help prepare me to work in this field.

Q.      When did you go to the National Fire Academy?

A.      Ooh.

Q.      About.

A.      2010 to 2012 maybe to 2013, '14ish.

Q.      And I know --

17

A.        No.  Greg, I'm off on that one.
Sorry.

Q.        That's okay.

A.        I finished the Executive Fire
Officer Program in 2018 as I was -- I received a
phone call to be appointed fire chief in my last
year there.  So back five years from there, so
2015ish forward.  '14, '15.

Q.        And from this training, what were
some of the takeaways you recall about how to
best manage employees at a firehouse?

A.        I'm not sure I understand.  The
best way to manage employees.  Well, we did a lot
of teamwork and group exercises to understand
group dynamics and labor management relations and
processes and systems that we could put in place
to effectively get people to work together as a
team.

Q.        And what were some of those or, if
you could, just summarize, what were some of
those processes that could be implemented to help
everyone work as a team?

A.        Well, I would say just try to build

18

a strong network of executive staff and understand, as a fire chief, you are on an island, and you never complain down.  So we spend a lot of time on managing stress and trying to take the weight and the burdens of the position that you hold as a fire chief and not to let it get to the rest of the members of the fire department.  And when I speak about it, it's mostly political pressure from the government or the local government or the jurisdiction in which you serve.  So I think that that's the -- that's the biggest thing, as a fire chief, you need to be able to buffer the people.  The police chief and I use to work on this stuff.  The fire chief, I'm the guy who's holding the umbrella so nobody in our organization gets wet.  It's my job to protect the people under my charge, both inside the firehouse and in the community that we serve.

Q.    Did you ever have any training on how to deal with employees who might be considered not living up to their job expectations?

A.    I wouldn't say specifically, no.

19

It's not one of the strengths in the fire service.

Q.    What do you mean by that, not one of the strengths?

A.    I guess I have worked my career to try to help move this part forward, but it's not something you deal with in company officer school, and it's not -- it's not one of the topics that everyone drills in on hard in some of the other programs.  'Cause Durham's a small community.  Across the country, not that there aren't other small communities, but often executive level officers that have taken this level training have a full HR department downtown and have a lot more resources than what we have here at the Town of Durham.

Q.    Mr. Emanuel, you're also involved with the International Association of Fire Chiefs.  I believe it's a bullying workplace harassment prevention committee; is that correct?

A.    Yes, it is.

Q.    Okay.  What -- how did you first become involved in that community?

20

A.        That's a great question, Greg.

Q.        That's why I'm here today.

A.        I love you.  My first year at the National Fire Academy -- they have this wall of outstanding achievements in excellence in education, and one person every year with the highest grade gets to put their name on the wall. And when I was there, I asked the instructor, I said how do you get on the wall?  And they said you have to write a kicking paper.  So over my two weeks there, we talked about a lot of different topics, one of which was bullying in the fire service, and that was an area that was under researched, under developed, under trained on, and I wrote a paper on bullying in the fire service, and the International Association of Fire Chiefs looked me up and said, Hey, you just wrote a paper on a position of interest.  Would you serve with our work group on this topic? Sure.

Q.        Nice.  What was the paper or -- strike that.  Yeah, what was the topic of your paper?

21

A.        Bullying in the fire service.

Q.        Well, I guess, yeah, what specifically, or can you provide some details about what that paper talked about?

A.        Literally, Greg, that was it.  We did some survey work across the state to -- I didn't have -- we didn't have a perfect survey instrument, but we were trying to understand the dynamics in fire stations and as its people progressed through their career in the fire department to identify any bullying behaviors that hit during probation or during someone's acclimation period or throughout their career at the fire station.  So we were looking for themes or trends, how much education people had related to this kind of human resource topic again, because it's under trained on, and taking the temperature of it and our findings.  That was -- I guess the bottom line is, is more education and training required, and my answer was yes.

Q.        Mm-hmm.  And what did you -- what kind of training did you think would help prevent bullying in the firehouse?

22

A.        That's a great question.  We have identified the need for open, honest dialogue in conversation at each firehouse to sway the minds of individuals, one person at a time, to know that the world wasn't the same as it was 20 years ago, and if we can treat each other with kindness, dignity and respect, it goes a long way.  And I guess, specifically, we identified different behaviors that people use to take advantage of a power imbalance to, to identify that and be able to address it directly.

It would provide tools through interactions and exercises to say, Mr. Silverman, bullying is not okay, and what you just said makes me feel this way and what can we do about it.

Q.        Mm-hmm.  Would -- or I guess were there any recommendations about how to specifically deal with bullying in the firehouse, concrete steps departments could take?

A.        Just a training program to give people tools in the tool kit.

Q.        Yeah.  I guess what would those

23

tools look like?

A.    Well, think, plan, act was -- is the basic mantra that we talk about, and I would say, Greg, you need to think about what they just said or how it made you feel.  Plan:  Figure out who you need to talk to validate whether it's you or whether it's something else.  And then act is, you know, on the spectrum of actions to take, what's most appropriate both for you and your organization.

Q.    Understood.  Could actions include group meetings with various people at the firehouse?

A.    Absolutely.

Q.    Could actions include like one-on-one meetings with two particular people at the firehouse?

A.    Yes.

Q.    Mr. Emanuel, have you ever received any training on compliance with the Americans With Disabilities Act?

A.    Not directly that I am aware of. Other than general topics, no.

24

Q.      What were those general topics?

A.      Well, just that if someone makes a request, we would do everything we could to grant that or to acknowledge it and work with them to sort of make them succeed.

Q.      Yeah.  What kind of request might that be?

A.      It might be an elevator.  It might be special work accommodations.  It might be a sit/stand desk.  It could -- you know, it could be a wide variety.  It could be just about anything.

Q.      Sure.  What about -- well, let me ask about -- let me go back to bullying.

        Does mental health in the firehouse play a role in bullying or bullying prevention?

A.      Yes, it does.

Q.      How?

A.      Conflicts should be -- conflict doesn't have to be negative.  Conflict is natural, and conflict should be something that we both can use as a growth tool in the proper environment.  So a disagreement or a different

25

way of looking at something is productive in my opinion.  Some people can't process conflict, and some people choose to use power imbalances to either create it or resolve it.

Q.    For people who have a difficult time processing conflict, are there -- do you know of any tools or actions that might help resolve issues with that with a person who has difficulty with conflict?

A.    Absolutely.  Yes.  I mean, we've -- we study it, and we try to work through it here as a group here at the fire station frequently.

Q.    Yeah.  How?

A.    We try to identify what we have in common, and we try to identify what the outcome that each of us are looking for is, and we try to identify paths to resolve the conflict or achieve -- if we're both trying to get to the same endpoint, how can we create a win-win situation, so it doesn't have -- you know, we resolve the conflict.

Q.    Right.  And what are -- in terms of ways to try and resolve that conflict, I mean,

26

could that involve a meeting -- a one-on-one meeting to try and discuss those issues and see how to move forward?

A.        It could, absolutely.  And we had had -- we had had a consultant working with our leadership team trying to help us conduct those conversations because it was challenging for us to do it within our own walls.

Q.        Yeah.  That was Mr. Rowan, correct?

A.        That's correct.

Q.        Okay.  Then we'll talk about him later.

Mr. Emanuel, I'm sharing my screen again.  I want to talk about topic number 4, and this would include plaintiff's employment record, and mentioned in number 4 is attendance, job performance, discipline, compliance with town policies and scheduled hours and essential duties.

(Whereupon, Deposition Exhibit 2,

John Powers, Town of Durham Employment

Timeline (RESP 000172),

was marked for identification.)

27

*BY MR. SILVERMAN:*

Q.     All right, Mr. Emanuel, I've shared my screen.  I've marked as Exhibit 2 a document Bates stamped at the bottom RESP 172.  This says at the top, "John Powers, Town of Durham Employment timeline."  Do you see it?

A.     I do.

Q.     Is this timeline of Mr. Powers's employment with the town accurate?

A.     To my knowledge.

Q.     You were working at the town when Mr. Powers was hired in May of 2011, correct?

A.     Correct.

Q.     Okay.  Did the town have a fire inspector when Mr. Powers was hired?  First, in 2011?

A.     I do not recall.

Q.     That's okay.  Who was the fire chief when Mr. Powers was first hired?

A.     I believe that was Corey Landry.

Q.     And do you know what kind of background checks the town did for new hires in 2011?

28

A.        Not intimately because I was functioning as a company officer, and I was not -- I was not dialed in at that level in the fire department administration.

I know that they had a process, and I know the fire chief at that time was intimately involved in it, and I was not.

Q.        Do you know if new hires in 2011 went through background checks?

A.        I'm confident that the fire chief conducted some sort of background check, yes.

Q.        Okay.  Do you know if new hires in 2011 ever underwent like a psychological evaluation?

A.        I'm confident that they did, but again, I was not privy to that information.

Q.        Did new hires -- strike that.

Did the town in 2011 request any kind of medical records for new hires in '21?

A.        Request?  I wouldn't say we would have requested it, but I would, I would -- I don't know what we would have requested.  I would expect to have had a department physical, but

29

that's not a request, that's a go get your physical.

Q.    That's fair.

A.    I mean, again -- and, Greg, let me clarify.

Q.    Please.

A.    The things that you're asking about would have been conditions of employment.  We're going to give you a conditional offer of employment, you're going to get a health screening, a psychological evaluation and a background check package.  When those are completed and cleared, you would be hired, you'd get an offer of employment.

Q.    Understood.  You're just not sure whether the town in 2011 asked for someone's medical records in that process?

A.    I do not know that.

Q.    I stopped sharing my screen.

A.    I can see you again, though.

Q.    That's good.  All right, so Exhibit 2 says Mr. Powers he was a -- he got hired as a fire inspector in 2011, promoted to

30

deputy chief in 2012.  He went out on FMLA leave for a couple months in 2016.  Do you know why Mr. Powers went out on FMLA leave then?

A.    You know, I don't know that I -- not from an official standpoint.  I know John and I spent a lot of time together back in that point in time, and he was under a tremendous amount of -- well, we were both under a tremendous amount of stress under that fire chief.

Q.    So you think the FMLA leave was because of stress?

A.    That's what I would -- that's what I think, but again, I am not -- I don't recall being part of that conversation loop with the fire chief.  The fire chief at the time held the cards very close to his vest, and I worked with John a lot during that period of time, not the fire chief.

Q.    Understood.  I've heard a lot about Mr. Landry.

A.    Yeah.  Sorry.

Q.    Oh, that's okay.  I'm not asking you to weigh in on that.

31

And then Mr. Powers resigned at the end of 2016, right?

A.    I'm fuzzy on times, but I believe if you're showing a department memo where that's the date, then I trust John, and I believe that that's the date.

Q.    Okay.  All right, let's talk about that time.  I'll call it John's first stint with the town.

You mentioned that the fire chief then was a source of stress for both you and John, correct?

A.    Yes.

Q.    Okay.  Did -- well, let me back up for a second.

During that first stint, how did you and John work together, or how did your duties overlap?

A.    Well, I would say our duties would overlap because, as the number two and number three officers for the fire department, it was our job to make sure that, A, we protected the people that worked for us, and you know, if one

32

of us couldn't do something, the other one would try to make up for it and whether that was responding to incidents or conducting training or working with the people under our watch.

So I was the assistant chief of operations, and John was the deputy of prevention, and you know, I think we covered for each others meetings. We worked together on community planning, developing risk reduction strategies and trying to work through a challenging time here at the fire department.

Q.    Yeah, let's talk about that. So I understand the chief was or the former chief was a cause of stress. And, again, I'm not asking you to bad-mouth Mr. Landry, but you know, just what -- what were some of the chief's actions that caused you stress during that time?

A.    I would say he had a pretty good pattern of belittling or making things personal that didn't need to be personal, and he didn't hold back on whether it's yelling or raising your voice or just telling you how stupid you were or not understanding why you couldn't do your job,

33

and framing things to the most negative place that you could.  Some days.  Some days he was fine.

Q.      Fair.  Did the former chief ever make himself available to sit down and potentially work through that conflict?

A.      He and I had a lot of personal conversations about how he treated me.  I didn't -- I know that he, John and I had some conversations about how he treated John, but I wasn't in that lane.

Q.      Yeah.  How did you see the chief treat John -- I'll withdraw that.

Did you ever see the chief treat John in a way that you thought was disrespectful or creating unnecessary conflict?

A.      Yes.

Q.      How?

A.      Well, I think that I try and outline in whether it's comments in the hallway or comments at the kitchen table.  Some of the comments and conversations that our previous fire chief had with each of us were not always in the

34

appropriate setting, and that's -- once you undermine the trust of someone or you paint someone in a corner, again, you've -- the power imbalance is already there by that paramilitary rank structure to begin with.  So when you undermine that further or push the scale further, it's all bad.

Q.      Did you -- yeah, I guess or strike that.

Did John ever tell you how he felt like the chief might not have been supporting his efforts in the prevention office?

A.      Yes.

Q.      What did John convey to you about that?

A.      I just -- I remember there being communication and conflict issues where I would be working with John trying to help frame up the discussion points so he could work with the fire chief, and whether it was simplifying the message or consolidating the message or, you know, we had talked about putting together presentation slides to say this is -- this is the intended result or

35

this is the desired outcome, and these are the three steps we need to get to get there, the three steps that would help us get there, much like a conflict resolution.

Q.    Sure.  You mentioned that you tried to help John simplify or consolidate his message to the chief; is that right?

A.    Yes.

Q.    John -- in your experience during John's first stint, did you recommend that John simplify or consolidate his message 'cause he had a tendency to be somewhat wordy or provide too much information?

A.    I just -- I think we were trying to adapt John's style to what the chief could work with.  I don't recall specifics.  I mean, I would have said clarity.

Q.    Sure.  And how would you describe John's style in his first stint?

A.    John is -- John was in his first stint I would say an analyzer who was always trying to -- he's very dedicated, and he works very hard.  His priorities were not always

36

aligned with the chiefs, and when the chief would say you need to do this, he didn't want to hear but or I need to.  He just wanted address this by the timeline that he said.  So John and I would try to walk a few times a week just to be, A, outside, B, moving and C, away from the fire chief, and we'd say, John, he wants it by Friday, what can we do to put something together by Friday, one pager, one paragraph, something so you can go meet with him, or I'll go with you if you need me to, but we need to be able to answer his question in the time frame he said in a way that he can understand it.

Q.    Do you think John's style was, or did John provide too much information to the chief and the chief needed it in a more condensed way?

A.    I don't recall that level of detail.  I just know that it wasn't compatible.

Q.    Yeah.  I'm just trying to figure out -- when you say it wasn't compatible, I'm trying to figure out or to compare the styles -- right? -- John was a certain way, the chief was

37

this way.  How did their styles clash?

A.      When we worked on our DISC assessments in 2014, the fire chief was the only guy in the red out here.  He was a football referee, and he made snap judgments on a lot of things and that was his style and communication style.  John was an analyzer who puts together all the data and information, and sometimes we'd have challenges, meaning the time frame that we needed to meet or to multitask on the number of programs, which isn't always fair, but we're in a municipal environment that's not forgiving.  Does that answer your question?

Q.      It does.  That was helpful.  You brought up DISC assessments.  That was something that Chief Landry had done I think you mentioned in 2014, correct?

A.      I think so.  And we've done it a number of times, Greg, over my time here.

Q.      You've done DISC assessments?

A.      Yes.

Q.      Okay.  Did you do DISC assessments during John's second stint when he was back the

38

second time?

A.      I don't recall.  We have done it since 2014 a number of times.  I don't recall when they were performed.

Q.      Okay.  You did a DISC assessment yourself; is that correct?

A.      Correct.

Q.      Okay.  And where did you end up on the assessment?

A.      I am a promoter and a collaborator who tries to put things together for the good of the organization.

Q.      And how did -- after these DISC assessments were done, how did the department use them, if at all, to try and help people work together?

A.      We -- I think initially we worked with Primex, our property liability insurance carrier, to facilitate a training for what it means and what we can learn about ourselves and our co-workers to help us understand people's preferences for how we communicate and work together, knowing that if we have different

39

styles what can we find for common ground so we can both be successful.

Q.      You mentioned that you and John would take walks during his first stint; is that right?

A.      Yes.

Q.      Okay.  I assume you commiserated about your boss, correct?

A.      Some.  But, I mean, I don't -- I don't -- I try not to focus on the negative.  I mean, back to the nature, my nature, I look at the positive and what we can do to move forward, not to dwell in the past or what this guy did. We were always -- from my prospective, I was trying to be a lifeline to say, John, what can we do to get past this because we can do it.

Q.      Yeah.  Would you consider yourself during that first stint or strike that.

During the first stint, would you consider yourself friends with John at that point?

A.      Yes.

Q.      Okay.  Close friends?  Just work

40

colleagues?  How would you describe that friendship?

A.    I lose track over the years, Greg. I mean, John and Heather went to hockey games with us.  We did some social stuff out of work. My kids are a couple years ahead of John's, so, you know, when my kids outgrew the fire department T-shirts or the toy or the game, I'd bring them to John and say, John, frigging go for it, you know, which -- anything that you don't have to buy or recreate, you know, we just -- there was a guy in Exeter, and there was John. Those are the two people that we shipped a lot of our stuff too.

Q.    Yeah.

A.    Just trying to pay it forward.

Q.    When John went out on FMLA leave, you mentioned you recalled that was because of stress?

A.    That's what I recall but I --

Q.    Okay.  Do you recall an incident or anything that might have led John to take FMLA leave?

41

A.        I do not, and I don't have access or I never went to -- I never got any of that.  I don't recall any.  I don't recall, Greg.

Q.        Sure.  During John's first stint, were you aware he was seeing a therapist?

A.        I think so.

Q.        Do you know --

A.        I know --

Q.        Go ahead.

A.        I'm pretty sure most of my time with John he had a weekly appointment in Exeter to work through his challenges.

Q.        Did he ever describe what those challenges may have been?

A.        In what kind of context, or what are you -- can you give me more of a --

Q.        Fair, fair.  You mentioned John was working through his challenges, and my question is what did you understand those challenges to be?

A.        John had -- we are not the same age, but he was doing work in Kingston when I was -- I grew up in Stratham, so we knew circles

42

very closely, and John was working at the Exeter Hospital as a security officer, and I can't tell you whether it was the early '90s or what point in time that was, but I know that he experienced a critical incident that we talked about a number of times that didn't do him any favors. It definitely left scars. And, you know, I don't -- that would be -- that's the thing that I remember. You know, I don't know how much you want me to talk about that. John experienced a horrific incident when he was at work, and Greg, we all experience different things over our careers, and we all deal with it differently, and John was just ahead of some of us in seeking counseling or having the support that he needed while he was working through that. So that was -- it wasn't a question or a right or privilege. That's something you do. And in my opinion, he was leading by example, by seeing somebody and being proactive to maintain his health.

Q.    Was John -- in your experience, was John open about I guess his need to go see a

43

counselor weekly?

A.    Open?  It was an accepted thing. That's something that you just do.  That's not -- it's like any other doctors appointment.  You know, mental health and physical health are the same thing in my opinion.  I know it's taboo some places.  It's not in the firehouse, and it can't be.  I think John was very open about it.  I mean, it just -- I don't know everybody that was on duty with him that night when he experienced that horrific tragedy, but I know a number of people that were involved in it.  So, I mean, my job as a friend is to listen.  It's not my job to judge or try to say I understand what you're going through.  I can only imagine what he went through and the lasting effects of that event.

Q.    Sure.  Did John ever tell you how he benefitted from going to counseling?

A.    I don't remember conversations about that per se, other than, you know, I always -- if it wasn't a benefit, I don't think John would have done it.

Q.    Sure, sure.  Did he ever talk about

44

like if John didn't go to counseling how that might effect him?

A.    I don't recall that either.

Q.    Okay.  Did he ever tell you he was diagnosed with PTSD?

A.    I remember -- we've had a lot of conversations about PTSD.  I don't recall ever seeing a formal diagnosis, but I wouldn't have asked for one any way because -- I'm not a clinician, but I would tell you most people here at the fire department and the emergency services that have been doing it for the length of time that John and I have, we all have PTSD.  It's just a matter of how bad it is or whether it's diagnosed.

Q.    Right.  But did John ever -- do you recall John ever telling you that he was diagnosed with PTSD or had it?

A.    I know he said he had it, absolutely.

Q.    Okay.  Yeah, and I think you mentioned -- my next question is how common is PTSD in the firehouse?

45

A.    Diagnosed is I would say rare, but undiagnosed I would -- again, if we were going to go out back right now and poll the crew, I would say that three or four out of the five or six working right now would tell you that they have some form of PTSD.

Q.    And -- go ahead.

A.    It's commonplace.  It's not -- back in the '90s or early 2000s it might have been something that you would say, Oh, that's bad.  It is right now.  It's accepted.  And our crews today are far more open about seeing -- seeking help or seeing counselors or doing whatever they need to do to take care of themself, and it's supported a hundred percent by the Town of Durham.

Q.    If someone is experiencing -- strike that.

Do you know how or have you received any kind of education about how PTSD symptoms might play out with someone?

A.    I think, yes.  We all talk about that, and we talk about -- you know, some of the

46

symptoms might be migraines, insomnia, GI, paranoid episodes, paranoid episodes, paranoid episodes, antisocial behaviors, loss of focus and concentration.  There's usually, you know, 10 to 12 different symptoms that we would identify or we would identify with PTSD.  To say, Greg, we're observing this, what can we do to support you.

Q.      I want to go to -- do you know why John left Durham in 2016?

A.      He had a better offer with the Rochester Fire Department as a deputy chief.

Q.      Do you know if part of his reason for leaving was due to Chief Landry?

A.      I believe it was, but again, I don't recall the specifics.

Q.      After John left Durham the first time, did you stay in contact with John?

A.      From time to time.  I don't think we were in constant contact, no, but an occasional hey, hey.

Q.      How are you doing?

A.      Yeah.  I know -- I mean, I know that when I was Rochester I'd stop by to say hi

47

and see how he was, but it was -- I can't remember if he was there that day or not, but I know that I'd been in -- I was in his office when he was in Rochester just because.  That's, Hey, how's life, man.

Q.    Yeah.  So would you still consider yourself friends after John left?

A.    Yes.

Q.    I might have asked this, and I apologize if I'm repeating myself, but do you recall if John ever communicated to you his issues with Chief Landry as to how it effected his job at the prevention office?

A.    I'm sure we talked about that on our walks.  My main job was to listen.  Again, I -- to listen and support.  We both knew the person we worked for wasn't healthy for either of us.

(Whereupon, Deposition Exhibit 3, 4/13/18 letter to Fire Chief David F. Emanuel from John T. Powers, Jr., was marked for identification.)

*BY MR. SILVERMAN:*

48

Q.      Yeah, fair.  Mr. Landry or Mr. --
apologies.  No offense.

Mr. Emanuel, I've shared a document
that's been marked as Exhibit 3.  This is Bates
stamped at the bottom right RESP 163 and PF-189
and goes to RESP 168 and PF-194.

Mr. Emanuel, have you seen this
letter before?

A.      Yes.

Q.      And this is John's cover letter for
his application to work at the department for a
second time, correct?

A.      Yes.

Q.      In this first paragraph, second
sentence Mr. Powers says he is ecstatic at the
prospect of returning to Durham.  Do you see
that?

A.      Yes.

Q.      Okay.  Were you also ecstatic or
looking forward to having Mr. Powers return?

A.      Yes.

Q.      And why was that?

A.      'Cause I had worked with him

49

before.  I knew that he knew the job.  He knew the community.  And he is excellent in the area that we needed the help in.  And the problem that had plagued or challenged both of us before was no longer present.  That barrier had been removed.  I should be clear.  We had a different fire chief, and I believe that we were both going to be in a good position.

Q.    Understood.  Mr. Emanuel, I've shared what was marked as Exhibit 3 at Mr. Powers's deposition.  I'll represent to you my understanding is that this was -- this is the posting for the deputy chief fire prevention job.  Can you see what I'm scrolling on your screen?

A.    Yes, sir.

Q.    Okay.  And I know, or at least my understanding is, this was an issue down the road, but this job posting mentioned expected ability in skills, and then I highlighted that first paragraph under that that starts with "ability to establish and maintain effective working relationships."  Do you see that?

A.    I do.

50

Q.     So at the time John was hired the second time, was it your belief that John could accomplish the tasks mentioned in this paragraph?

A.     Yes.

Q.     Okay.  I want to -- I'm looking again at Exhibit 1.  This is the deposition topics.  4 (a) attendance record.  Generally how was John's attendance record during his second stint?

A.     I would say in general we started off really well and then had challenges at the end of that stint.

Q.     What were some of the challenges?

A.     The challenges would be John would be absent from scheduled meetings and appointments that were critical to the success of the fire department.  I think that was the biggest one.  Followed by we -- we, the three chief officers of the fire department, were all salaried employees.  We have to cover a lot of ground 'cause there's far more work than any of us can do here in Durham, and it was at the end of John's tenure here.  It was -- people inside

51

and outside of the fire department were having challenges reaching or communicating with John or him being in the place where they thought he was supposed to be or where he had said he would be.

Q.    Did you ever talk with John about those issues?

A.    Yes.

Q.    Okay.  And how did John respond?

A.    It depended on which issue it was. Sometimes he would have a conflict at home. Sometimes he just wouldn't be where he was supposed to be.  Sometimes he would be sick. There are a number of different reasons.  I don't remember all the specifics, but yeah, of course we spoke about it.

Q.    Did John have an explanation as to what may have happened?

A.    Sometimes.

Q.    And do you recall what it was?

A.    Well, I think some of them at the end -- for the general where were you, it was I had to take care of my kid or Heather needed something or there's childcare coverage or, for

52

the general.

On the specifics like where were you during the state fire marshal's meeting, I don't recall specifics for those, or what happened to the town's technical review committee on this project for the planning board.  I don't remember getting good answers on those.  Occasionally there would be conflicts, Greg, where there'd be more than one meeting going on at the same time, and if John knew in advance, he would ask one of us to cover it, and one of us would cover it.  It's just that communication wasn't always there, and I'd get a phone call from the state fire marshal saying what happened to your deputy chief or the planning director saying I really needed the fire department feedback, today was the deadline, or the code enforcement officer saying you guys should have been at the planing board meeting.

Q.    Was it like John to not make these meetings?

A.    At the end of his career, it was becoming a frequent recurrence.

53

Q.      Okay.  But those types of things had not happened prior to the time period we're talking about; is that correct?

A.      I think so.  At least not with the frequency.  Yes, something changed.

Q.      Yeah.  Did you ever talk with him about what might have changed?

A.      I know I asked a number of times what we can do.  I guess the things I was trying to work with revolved around order, what can we do to align our expectations, what can I do to support you, and I committed that to several different memos or communications with John.  You know, I would say, John, we need to talk about this.  What can I do?  What do we need to do differently because this is -- we're having a challenge here.

Q.      Do you recall what John said in response?

A.      I don't remember a solid response.

Q.      Do you remember what he said or do you have any recollection about what he may have said?

54

A.      Well, I know we grounded a lot on our personality differences because we don't approach the problem the same way, and he'd frequently tell me I was either wrong or he had too much to do or there was too much to do, and he couldn't -- he just couldn't do it.

Q.      When he said he had a lot going on and couldn't do it, what was your response?

A.      You know, what can we do to support you.  I mean, when we were -- at this point in time, Greg, we were working with a deputy chief and two inspectors, and I said, John, we'll find money to bring in a firefighter to help with inspections.  What can we do to make the pipe bigger so we can alleviate some of the stress.

Q.      And was John receptive to that?

A.      He was when he spoke about it, but I'm not sure that we ever executed it to its fullest potential.  Because I'd say, John, I need your help.  We'll free up the person.  Tell us who you want, where you need them and where they need to be, what do we need to do, and I don't remember that part of it working well.  I

55

remember asking time after time, like when are we going to -- when are we going to start using the help.

Q.    Had you hired help or did you need to do that?

A.    We were going to use a former inspector and pay them overtime to work for John.

Q.    Before John left the department, had that happened yet?

A.    I think we used -- we used some but not to the extent that we had spoken about or that we had tried to.

Q.    I want to talk about working from home.  Was there -- strike that.

Were there times John worked from home?

A.    At the end, yes.

Q.    Okay.  And what was the policy or strike that.

What were your thoughts about John working at home?

A.    My thoughts were if it's a supportive environment and you can accomplish

56

things at home that you can't from the office, we just need to figure out where and when you're doing it so our staff here can direct the phone calls or the people to the right wherever you want to receive the calls.

Q.    And how did John respond to that?

A.    He would -- he'd often tell me where he would be, but he wouldn't communicate it to the staff, so our administrative staff would never know where he was.

Q.    Did they -- I mean, they had his phone, right?  They could have called or texted?

A.    And they did, and the common response was he doesn't answer his phone and he doesn't text back.

Q.    John's work calendar, was that shared?

A.    I believe so, but I wasn't -- I don't -- I'm sure it was because we all have Outlook in the town.  I just -- I don't recall trying to be on John's calendar.  I know that they would because the fire prevention administrative assistant would help schedule some

of those appointments.

Q.    Got it.

A.    And we were working between two departments on different platforms.  So the building department was always trying to schedule a building inspector and a fire inspector at the same time, so I am confident that we had shared calendars and --

Q.    Yeah, well, you -- this is a question I personally had.  I'm interested in, and I know it's a source of friction in the town, but I mean, the fire department does inspections, and my understanding is the town has its own inspection department, right?

A.    In 2020, that's correct.

Q.    That's correct.  Oh, what's the situation now?

A.    Well, when we lost our deputy chief, we reorganized the office, and the person that replaced John built a relationship with the building department.  So we don't duplicate inspections anymore, and we've been able to reduce the workload and increase the

58

communication.  So the fire department is in the locations the fire department needs to be when they need to be there.

Q.      But currently does the fire department have an inspector on staff?

A.      We do not.

Q.      Oh, okay.  Is the -- do you have someone or strike that.

Does the department have a prevention office in its purview?

A.      Yes.

Q.      Okay.  Does it have someone staffing the duties of prevention?

A.      Yes.

Q.      And is that person a fire department employee?

A.      Yes.

Q.      But they don't go out and do inspections?

A.      They do go out and do inspections.

Q.      Do they do inspections with another employee with the town building office?

A.      Occasionally but infrequently.

59

Q.      Okay.  So, yeah, how is -- how is that work collaborated with the town?

A.      It's collaborated because -- through -- we just -- we put all of our resources together and said fire department, building department, what can we do to work together to make things as best we can for our clients in the community and for the limited staff that we have. So we ceded some of the responsibilities of the fire chief and the authority they have and jurisdiction to the building department to conduct, whether it's gas or some of the different heating appliance inspections the building department does, whereas previously up to that point in time we either would send two people to go do it or the fire department would go do it.

Q.      And how has that worked out?

A.      It's been outstanding.

Q.      Yeah.

A.      I think we offer better customer service how we've streamlined the permitting process.  So instead of needing a fire department

60

permit and a town permit, there's one permit, there's one fee.  You go to town hall, and it's taken care of.

Q.        And this is a new process that began after John left in 2020; is that correct?

A.        Correct.

Q.        Okay.

A.        I can't remember if we had started some of the -- yeah, I think we had started the conversations with John, but we were not able to execute any of them.

Q.        Before this new collaboration with the town inspection office, I'm interested in just John's -- how often he was at the firehouse versus how often he was out of the office doing inspections.  Just for an estimate, like was that 50/50?  I mean, what was the typical time that John was in the office versus not in the office?

A.        I don't know how to answer that, Greg.  John had two inspectors that worked for him that did both what we just talked about with the building department and the housing standards.  I know he still did some inspections,

61

but we tried to have the firefighters perform the inspections and the deputy chief administer, plan, look forward and execute and, you know, to the quality assurance, that we're meeting our metrics. We did not expect John to be doing all the inspections. He had two people to do that for him, two people to do that for him.

Q. Sure. Was John -- as part of his job duties, was he expected to go out and do any inspections, or was he to delegate those to his subordinates?

A. Our preference in general was to delegate it to subordinates, but there are times of when it's something sensitive of nature or if it's a one-off that's going to require a strict code interpretation or adherence, John would work on those directly to problem solve.

Q. I want to talk about John's record of -- well, this might -- how are you feeling, Mr. Emanuel? Actually, can we go off the record, and Maryellen, can you note the time when we do.

THE COURT REPORTER: We're going of the record, and the time is 10:18 a.m.

62

(A break was taken 10:19 - 10:27.)

MR. MARTIN:  Usual stipulations, Greg.

MR. SILVERMAN:  Correct, agreed.

THE WITNESS:  What does that mean?

MR. SILVERMAN:  It's fancy lawyer speak.

MR. MARTIN:  Yeah.  30 days to read and sign.  It's a bunch of stuff about the transcript for the most part but nothing to worry about.

THE WITNESS:  I like it.

MR. SILVERMAN:  Good question, though.

Mr. Emanuel, we're back on the record.  I'm going to share my screen.  All right, we're back to Exhibit 1.  I want to talk about 4 (b), record of John's job performance. So my question for you is just based on, you know, your recollection.  What are the things -- what are some of the things that John did well in his job as deputy chief in the prevention office?

A.    John was well read.  I think he was

63

well versed in codes, and he really -- he thrived in the code environment where there was a black and white/yes or no framework for evaluation of properties or life safety concerns.

Q.   Earlier we looked at one of the expectations for this job was the ability to have effective and productive communication.  Do you remember that?

A.   Yes.

Q.   During John's first stint, do you think he had any issues with his communication?

A.   He didn't communicate -- he couldn't communicate with the fire chief effectively or the fire chief didn't want to communicate with John effectively.  I can't tell you.  There definitely were communication issues.

Q.   With the chief, sure.  Did John -- besides the chief in his first stint, did John have any issues with communication with other people in the community?

A.   Not that I recall.

Q.   Okay.

A.   But, you know, I wasn't evaluating

64

John or working with him at that level --

Q.      Sure.

A.      -- the first time.

Q.      Well, that is why I shared what was marked as Exhibit 5 in John's deposition.  This is a document Bates stamped DEF 167 through 169.  This looks like your review of John around March 2019.  Do you see that?

A.      I do, yes.

Q.      Okay, I'm going to look at competency area number 3.  It says John or, excuse me, "Powers strives to communicate at all levels within the fire Department."  Do you see that?

A.      Yes, I do.

Q.      Okay.  So at least in March 2019 you'd agree that John was, as you say below that, works to share information with administrative chiefs, other staff.  Is that accurate?

A.      Yes.

Q.      Okay.  Let's look at Opportunity 1, "Powers could strengthen interpersonal communication skills."  Number 1 it says, "John

65

is impacted by conflict and requires additional assistance and support to resolve issues related to people."  Do you see that?

A.    I do.

Q.    Okay.  What led you to write this?

A.    You know, on that date we were starting to encounter some different challenges. There were challenges within the personnel that reported to John directly.  He wasn't getting along with his inspectors, and he wasn't getting along with the administrative staff, our two administrative or one administrative -- he wasn't getting along well with our administrative assistants which caused a lot of strain and friction because they were trying to help John and support the prevention bureau, and they were meeting resistance.  That's what I would tell you the first one, impacted by conflict and requires additional assistance to support.  I would tell you that if there was a heated discussion or disagreement outside of the fire department or inside of the fire department, John would become flustered or twitterpated and need additional

66

support or reassurance that he could do it or we would help him through the conversation to resolve the conflict.

Q.    Did you ever talk with John about why he might be impacted by conflict?

A.    I don't recall.

Q.    Okay.  Did he ever -- well, let me back up.  Did you ever meet with him one on one after this evaluation?

A.    Absolutely.  That was part of our evaluation process.  You know, we redid our evaluation process in 2018, '17, '18, as I was becoming the fire chief, to take a straight black and white, yes/no, yes/no evaluation, to make it more meaningful for the professional development and growth of our employees.  So our evaluation process requires the employee to do a self-reflection, to meet with the supervisor and review it, and then give them the paper, and then the supervisor to complete the supervisor feedback, and then meet with the employee and then give them the paper.  So, yes, I am confident that I met with John.

67

Q.      Do you recall -- do you recall speaking with John about this issue that you thought he was impacted by conflict?

A.      Yes.

Q.      And do you recall what John's response was related to this topic?

A.      I would say generally we would talk about how as an analyzer he'd need some time to process it and process it and then work towards a resolution.

Q.      Were there any -- I know you had talked earlier today about back with John's first stint that you had kind of worked with him to figure out how to best communicate with Chief Landry.  After or during this evaluation process, did you ever talk with him about possible strategies in relation to conflict?

A.      I don't remember specific conversations, but I would say yes because we were always trying to address conflict better in the firehouse.

Firehouses are full of conflict no matter what we want or like, and it's not always

68

positive.  So we spend a lot of time working with our staff to say:  If you got a problem with somebody, talk with that person.  Resolve conflict at the lowest level possible.

Q.      Did John ever or strike that.

Competency number 2, "Powers can improve relationship with code enforcement official."  Do you see this?

A.      I do.

Q.      Okay.  And below it, it says, "The relationship between the fire department and code enforcement office is strained.  Trust, communication and teamwork are lacking."

Did that relationship exist before John was hired the second time with the code enforcement office?

A.      I'm confident that there was some, but I had always -- I believed it really was grounded in the previous fire chief.  He didn't like the code enforcement officer either.

Q.      Did you -- do you recall any conversations with John about how he might work to improve his relationship with this official?

69

A.      Yes.  I mean --

Q.      What did you talk about?

A.      -- specifics, we would -- we would have talked about trying to meet directly, to encourage face time and one-on-one contact, education and trying to be focused on the goal and the objective and not the person or not to make it about the building inspector.  To make it about the issue that we're trying to resolve.

Q.      And was John receptive to what you had to say there?

A.      No.

Q.      What did he say?

A.      If I remember correctly, he wrote a scathing letter discrediting the building code enforcement officer.

Q.      Was this a letter directly to them?

A.      I don't recall who it was to.  It was either to the code enforcement officer or the town administrator.  I don't remember which one of them he wrote it to.  But it was a point of friction that didn't work to resolve issues.  It worked to drive a wedge, to make things more

70

incompatible than they had been.

Q.    I want to go down to goal number 2, "Attend at least one professional development seminar on the topic of interpersonal communication."  Do you see this?

A.    I do, yes.

Q.    Okay.  Do you know if that ever occurred?

A.    I do not recall.

Q.    Okay.  What opportunities existed for this kind of professional development seminar?

A.    Our property liability insurance carrier, Primex, offers classes regularly both in person and online on this topic.  We regularly send -- I don't know, I attend, we attend or we send our people to attend them and whether it's on conflict resolution or listening or managing personnel.  They're frequently conducted through Primex.  And then we -- you know, there's always other online or in-person resources.  Around this point in time, we invested in a program at Cornell University for the leadership team to go

71

through conflict resolution, and I don't know, I think we bought between 10 and 15 seats in a conflict resolution certificate program so our staff could identify, diagnose and problem solve their way through this.  So it was not just a John Powers issue.

Q.    This was department-wide you found?

A.    We needed to work on it at the officer level and executive board level of the association for how to communicate and create win-wins as opposed to lose-loses, yes.

Q.    Do you know if John ever attended this Cornell seminar?

A.    I don't recall when exactly that fell in the timeline.  I don't believe he did, but that was the kind of development that we were offering our employees around this point in time.

So it was -- we -- because it cost a few thousand dollars a seat, it wasn't everybody in the fire department sign up for it, but it was offered to all the leadership positions for the union and for our leadership team of officer cadre here at the fire

72

department.

Q.        Understood.  All right, Mr. Emanuel I'm back on Exhibit 1.  This is --

A.        Greg, I just wanted to add on my first -- the first point under competencies or areas for improvement.

Q.        Sure.  You want me to move up?

A.        Right there.  The second page, the top of the second page.

Q.        Yup.

A.        Number 3, "John appears to" --

Q.        -- "be averse to conducting difficult conversations."  Yeah, what do you have to say on that?

A.        There was conflict within the fire prevention office that we were unable to resolve as an organization, and the inspectors -- the relationship John had with his inspectors wasn't perfect either, and it got worse over time, to the point where Matt Wilder wanted to transfer out of that position, and he filed grievances against John, and he had made things personal also which wasn't fair to John, but again, I was

73

having challenges with communication on multiple fronts that we just -- I couldn't -- I couldn't coach or mentor John to look at things differently.

Q. You said Mr. Wilder made things personal against John. Do you recall what happened?

A. I remember that he had, he had -- I don't remember all of it. I just know that Matt was upset with John. He didn't like him as a supervisor, and when he went to the union, they wrote a scathing letter about John which I view as being hurtful to the organization as well as John, and we tried to resolve this at the simplest level, and I was unsuccessful as the leader of the fire department.

Q. Do you recall like what -- I mean, he made it personal against John. Do you remember what he said that was personal?

A. They accused John of creating a toxic workplace environment in the fire prevention office, and I think -- I remember the biggest -- the biggest thing that they were

74

concerned of was John and I had worked on an approach to counsel or coach Matt through some of his challenges, and instead of meeting with him one on one like we just described for a review process or a normal or an effective conflict resolution approach, John left a memo on his desk.  So this guy found what he viewed as being a disparaging communication on his desk instead of having a face-to-face communication that:  Greg, we need to talk about something.  This is going to be a difficult conversation.  These are my expectations.  This is what I need you to do.  He found it on his desk, and the inspector found it offensive.  He found it very offensive.  I don't know if John intended to leave it on this individual's desk, like he just said I'll be right back and walked out.  All I know is they didn't have the conversation they needed to have which I think would have helped things.  I mean, that's what we were -- John and I had a game plan on this to bring the inspector into alignment with what John was trying to do and what we were trying to do, and it didn't work.

75

Q.      So you thought instead of, whether it was on purpose or not, but leaving the memo on Matt Wilder's desk and not first having just a person-to-person conversation was not a productive way to talk about things?

A.      I agree with that.  And we had talked -- John and I had talked, and I think Randy had worked on it as well, that we had walked through the conversations.  You got to have a conversation.  You can't just drop this on his desk.  I don't know what happened, but it didn't go the way we had planned.  We were trying to do the best we could for John and for Matt.

Q.      Sure.  Okay.

A.      You know, the same thing, they were -- they would email each other back and forth when they were in a 3 or 400 square foot office with three of them, and if they turned the chair around, they would have bumped into each other, and they would email each other back and forth instead of saying, hey, Greg, what do you think about this?  And it was the communication within the office was poor.  From both of them.

76

It wasn't just John.

Q.     Right.  So, in your opinion, instead of the lengthy written missives back and forth, everyone could have saved a lot more time if they had just sat down one on one and said, hey, let's try and sort this out?

A.     I don't know.  I'm not accusing John of writing lengthy missives to his staff.  I just know that Matt would say I needed a yes or no, and he would send me an email.

Q.     Yeah.

A.     And that played into number 4 because the feedback I would get is, hey, your deputy is not here.  I needed an answer, and he's not here.  I'd say, John has a department cell phone, did you call him?  Yeah, he didn't answer. Did you text him?  Maybe.  And, you know, it would differ every time.  But, see, John has all the tools to help you.  What am I not understanding.  It's just we kept hitting these communication hurdles, and there was always a different reason why somebody else was wrong.  It made for a poor working relationship which also

77

tainted the second inspector who subsequently left the organization, and that was shortly after John left.  She was not interested in working in that capacity anymore.  The whole office had been poisoned.  And we didn't lose John.  We lost John, Matt and Jess.

Q.      Did John have subordinates in his first stint at Durham?

A.      Initially when he started I think he was just the inspector, so he was -- he would have been working for the deputy chief.  I think he was working for Steve McCusker at that point in time.  So we had a deputy and one inspector.

Q.      Got it.

A.      Well, we knew we had a second inspector.  He might -- you know, I -- I don't have all my info. tight on that, Greg.  He might have served as an inspector with Matt Wilder's brother.  I don't remember exactly how the town lines lined up on those.

Q.      That's okay.  I'm just curious.  At some point in John's first stint, did he manage subordinates, if you recall?

78

A.        Yes.

Q.        Do you recall who his subordinate was?

A.        I would have guessed it was Artie Boutin, firefighter or inspector Arthur P. Boutin.

Q.        Okay.  And was there any kind of relationship issues between John and Mr. Boutin?

A.        I think it was hot and cold.  I think that they -- they were both similar type personalities on being able to -- they both excelled on reading and understanding the code and applying interpretations to what we had here in Durham.  So I think that they were closer aligned than Matt Wilder and John were.  They both -- they both were outstanding in their field.

Q.        Yeah.  Okay.  Mr. Emanuel, I want to go to Exhibit 1, 4 (c), plaintiff's record of discipline.  So do you know in John's first stint with the department was he ever the subject of formal discipline?

A.        I don't recall.

79

Q.      Okay.  All right, I've shared my screen.  This is a document that was marked as Exhibit 4 in plaintiff's deposition, Bates stamped at the bottom right DEF 50 through 52. Mr. Emanuel, have you seen this document before?

A.      Yes.

Q.      Did you prepare this document?

A.      Yes.

Q.      Okay.  Did you ever share this document with John?

A.      Yes.

Q.      Okay.  Do you recall the context in which you gave it to him?

A.      I would have -- either John and I sat down and went over it or Assistant Chief Trull and I sat down and went over it with John in person in our training room.

Q.      Okay.  Before you provided this document to John, was this -- like, did you call a special meeting to talk about it with him or was this just brought up with other things?

A.      I do not recall.  We were meeting frequently at that point in time.  I don't recall

80

whether this was a special meeting or not.

Q.    So it says, "Over the past week I've observed behaviors that are not normal for you."  So it's fair to say that these behaviors that John was displaying in your mind weren't typical for him, correct?

A.    Yes.

Q.    Did you ask him -- did you tell him that and ask him what might be happening?

A.    Yes, I'm sure we did.

Q.    Do you recall what he said?

A.    I do not.

Q.    So you don't know if he said, well, I'm having some family issues or whatever?  You just don't recall what his response might have been?

A.    Right.  I mean, Greg, this was around the time John was having -- I don't remember if it was a first or a second child. There was a lot moving.  There's no two days exactly alike here other than things move quickly, and it's not under our control.  Things influence us every day.  The things that caught

81

my attention was it just -- these things weren't necessarily things that John would have to reply to at all or right now, and both of those could have been resolved with a phone call or a, hey, are you going to take care of this or do you want me to, or Randy, are you or Dave on this or do you want me to, or hey, I need to brief you guys on something.  And the way it was communicated, wasn't consistent with the way that our team generally worked.

Q.    Do you recall -- did you tell that to John?

A.    I did.

Q.    Okay.  Do you recall his response?

A.    Just excuses like, well, I thought I should reply immediately or I needed to -- I needed them to understand, or there's no way that this can happen and I can't let it.  It's an imminent hazard.

Q.    Did you agree or disagree that it was an imminent hazard?

A.    I did disagree, yes.

Q.    But you weren't sure --

82

A.      Yes.

Q.      Go ahead.

A.      Greg, on the first paragraph, some of the staff sent an email -- our administrative assistant sent an email to other staff saying can ROTC park a vehicle in our location, and it could have been -- I guess my recommendation was, yes, but not there, and instead John had a really lengthy response attacking military officers and their perceived entitlement and the importance of fire lanes.  It just -- it was a yes-or-no question, and it became a personal -- there was something wrong.

Q.      Yeah.  And this seemed out of character for you, for John to write such emails?

A.      John seldom made short, succinct responses, but this was another area where when we were all overworked and trying to figure the world out, John, you don't have time to address that.  I'll take care of it.  Randy take care of it.  We met every week to figure out how we could work better together and to prioritize our workload.  These things weren't priorities for

83

John and shouldn't have been taking his time or he shouldn't have been distracted on these things.  It would have been better as a conversation or as a can't we just say no, please, or have them park over there, we're good. That's not how he chose to address it, and I think it compounded -- it compounded his challenges because he was making more work for himself.  We were trying to alleviate the burden. John was digging deeper.

Q.    Mr. Emanuel, I'm going to show you what's been marked as Exhibit 6 in Plaintiff's deposition Bates stamped at the bottom DEF 53. Have you seen this document before?

A.    Yes.

Q.    Okay.  Did you ever provide it to John?

A.    Yes.

Q.    Okay.  Do you recall under -- do you recall when you provided it to John?

A.    I would say if it's dated on December 18th, I would have said on or around December 18th, but I would have also said -- I

84

would have followed up with each of these incidents at the time I wrote the concern as well.  After the third one, we culminated it into one larger concern, say.  The fire department seldom receives complaints, period.  We received three complaints about a vehicle matching your description in a short period of time.  What's going on?

Q.    Yeah.  Do you recall what John said?

A.    There was a reason for each one of them.  I think the first one, December 12th, speed complaint was the other guy was aggressive, he was a jerk.  The second one, the red light, John told me about how the state RSAs said the funeral procession had the right-of-way and not people in the crosswalk.  And the third one, the speeding, I think it was the same thing, that guy was a jerk.

And my intention was to say, John, you're driving with a marked car, and you don't -- this isn't how you normal act.  What's going on?  What can we do?  Because we don't

85

normally get complaints about the fire department or you or your driving.  What's going on?

Q.        What did John say?

A.        I told you, he had an excuse for each.  He had a justification for each one of the things.  Or I know that he also thought that there was someone out to get him.  If I remember right, some of the complaints were signed and sealed and some were a phone call, and we weren't sharp enough to ask more questions when the call was received, and you know, John and I talked about that being a shortcoming for our organization because, Greg, if somebody calls to complain about Greg Silverman, I should get the name, the phone number or an email so the fire chief can call you back to finish the conversation.  We were not sharp enough at that point in time to have that be a part of the conversation.  So it was my job to talk to John about it and figure out what's going on.  I didn't say, John, you did these things.  I said, John, we got complaints about these things, and we don't usually get complaints.

86

Q.      Yeah.  I'm looking at the questions at the bottom.  Did you talk about three things that the department might do to support John?

A.      I remember asking that question.  I don't recall getting a response.

Q.      Did you provide three things or a couple things that John might do to align himself with the department's expectations?

A.      Well, I was asking him what he could do to align with our expectations.  My goal was just take a deep breath, and if you don't think you can drive, don't drive, or if something's wrong, let's take a time-out and figure out what we can do to help you succeed --

Q.      Mm-hmm.

A.      -- but I still need you to do your job.

One of John's solutions to the driving thing was to not drive a company car.  One of the other solutions was to write a formal complaint policy so people had to field complaints in a certain way to fill out all the documentations.  And although at the surface not

87

driving a company car definitely would have solved the problem, as a chief officer for the Durham Fire Department, I expect -- you know, we took turns responding to emergencies both on and off duty.  To live in a community a few communities away and not have a company car and to expect him to respond to emergencies isn't aligned with the expectations of the fire department.  So he had a few solutions, but none of them were realistic if you wanted to be functioning at a chief level officer position.  So --

Q.      Did you communicate that to John?

A.      Yes.

Q.      And do you recall his response?

A.      No.  I don't recall him having a response.  I don't recall what he said.  What can we do to support you.

Q.      Yeah, but you don't recall what John may have responded with?

A.      Well, on different occasions.  I don't remember on this letter.

Q.      No, sure.  Sure.  And I think we

88

might get there later.

A.     Well, sometimes it would just be like, well, I need time to process, I need time to process.

Q.     Yeah.  Did he say that for this memo?

A.     I don't recall that being aligned with this memo because this was specific to driving, and I mean, the guy was at a funeral, so it's already emotionally charged.  There's something going on.  I mean, he could have been distracted.  He could have been distraught.  He could have been emotionally upset.  I don't remember having those conversations.  I remember him telling me that the RSA said he had the right-of-way.

Q.     Yeah.

A.     If there's a person in a crosswalk, and they're stepping in front of you, you got to stop your car, it doesn't matter who has the right-of-way.  And I don't think I noted it in this memo, but if I remember right, it was a woman pushing a baby carriage that called and

89

complained.  It was bad, Greg.

Q.    Do you recall the funeral?

A.    No.

Q.    Okay.

A.    I don't believe it was a mutual friend.  I mean, it's a funeral.  John cared about people.  Take the car and go to the funeral.

Q.    Yeah.  Well, you mentioned John saying sometimes he needed time to process.  Did he say that often?

A.    I don't know.  It depends on the issue.

Q.    Yeah.

A.    Some things -- again, in a command capacity, if you're managing an incident, you don't get time to process.  If you're working on a housing standards ordinance that's going to go through six months of revisions, you have time to process.  So we would constantly be bouncing back and forth between different modes.  And, again, although we're leaders in the fire department, we don't always get to dictate or determine which

90

mode we're in.

Q.    Let me ask you about that because, you know, there were times where John was acting chief of the department either if you or Mr. Landry or, you know, the ranking number two were gone, correct?

A.    I believe so.

Q.    Yeah.  Okay, so just to clarify, John's first stint and his second stint with the department, he was essentially the number three in charge?

A.    Yes, he was the number three in charge --

Q.    Okay.

A.    -- which is a weighty responsibility.

Q.    Sure.  There were -- in John's first stint with the department, do you recall any issues anyone may have had with John when he was serving in the acting chief role?

A.    I do not.

Q.    Okay.  How about the second stint?

A.    I do not.

91

Q.        Okay.  All right.  I'm looking at Exhibit No. 1 again.  I'm looking at 4 (e), plaintiff's scheduled hours and essential duties in 2020 while a town employee.  What were John's essential -- sorry.  What were John's scheduled hours?

A.        As a salary employee, generally whatever it takes.  And it was not -- we were not -- our goal was general business hours, 8 to 5, 9 to 5.  But because of the nature of John's work, or any inspectors for the prevention bureau, if we were putting a new residence hall online or doing a new fire inspection, like fire alarm testing, at 4 a.m. or 6 a.m. or 9 p.m., I mean, John would be very accommodating and come in and do that.  So, you know, we were very flexible on time.  And at this point in time, we also -- we had a lot of events and special events and big things going on at UNH.  So a lot of fire chiefs will say, Dave, why don't you go do this, you got all the time in the world.  I'll say you don't work an extra weekend a month or you're not in an extra night a week, so cover the concert or

92

the visit or the whatever is going on on campus. So our whole command staff was routinely working odd hours. And we don't -- we don't punch in or punch out. We trust each other, and we have a very supportive town and a strong working environment, and we know it's wonky. And I know John worked hard to cover things that were not during the normal business hours. So we have -- you know, when I was president of the managers local, the association that represented the managers, the town had gone through a grievance process where a town employee had always tracked their hours as a salary employee, and the town said, you're a salary employee, don't track your hours. So I was very direct about that, we're salary employees. I'm not asking you to make things up. You do the best you can to balance things. We work in a hard job, a difficult environment. I need your family to be whole at home, I need you to be whole, and we need to do our best at work.

Q.    Yeah. What about sick leave time, did John have a certain number of paid time off

93

hours?

A.      Yes.

Q.      Okay.  And I assume there was some process when John was out sick he was -- how did he notify the department of that?

A.      It would depend on which one it was.  Our process is to -- I probably have them. We have a simple leave request form that every employee fills out depending on what kind of leave you're going to use.

Q.      Sure.

A.      And if you're going to take a day off, we need to record it that way.  But one of the challenges we had was John would take time off or tell me he was taking time off and then not log it as time off which goes back to the issue or the concern you just brought up.  We all have -- we accrue time at different rates.  I don't remember what John's was at that time.  But if I'm going to take a day off because I don't feel well, I'm supposed to file a leave report that says I'm out on sick leave or I'm taking tomorrow on vacation.  And at the end of John's

94

tenure, we had a number of conversations about, John, I support you a hundred percent on being out sick for the day, but you have to file something or don't go out sick for the day and tell me you're working from home or don't work from home and then tell me you're out sick for the day. Tell me which it is just so we can close our payroll in an effective manner. But, again, the Town of Durham is very liberal. How do I say it. The Town of Durham works hard to support its employees. John went to counseling for years. That's not sick time. That's something you need to do. Don't file sick time on that. And if my boss put me in the grinder to say why didn't you file sick time, that's something -- whether you're in physical therapy, a doctor's appointment, a dentist appointment. We're salaried employees, just you make it work. If you need to take a day off or if you're going to be out for a block of time, you file leave. If it's a regular I'm at the therapist for an hour, we're good.

Q.    Understood.

95

A.      I just say that, Greg, because sometimes some employers will say, Greg Silverman, you have a Wednesday appointment, I don't have a leave slip for your two hours you were gone.  That's not our bag.  We don't do that.  Right, wrong or different.

Q.      Sure, sure.  I want to -- I'm going to share my screen.  Take a look at number 6, the rate of pay John could have received from the town if he was not terminated in 2020.  Do you know what John's salary for 2020 was?

A.      I would guess around $95,000.

Q.      Okay.

A.      In that range.

Q.      Does the town, and I'll ask it like do you know how much, you know, John's pay would have been if he wasn't terminated for 2021?

A.      For 2021, no.  It would have been around the same.  You know, we usually get a 2 or 3 percent COLA for non-union or exempt employees.

Q.      Okay.  What would be the best way to obtain that information of what the COLA was for employees?  Like, does the town have

96

documents on that?

A.       The business office would.

Q.       And just to clarify, are there any merit bonuses that you could have provided to a deputy chief in the prevention office or does everybody get the same raise?

A.       Those kind of decisions are made downtown.  I don't -- you know, I complete the reviews, but my experience has been I haven't been consulted on merit or cost-of-living adjustments.

Q.       But is it possible -- like, for example, Randy Trull has been with the department since 2020, right?

A.       Yes.

Q.       Has he received any merit bonuses do you know?

A.       I don't think the town administrator's office calls them merit bonuses. We've done some market adjustments.  I don't think any of us get merit bonuses.  They're pretty tight with their money.

Q.       I figured.  So you're --

97

A.      No, I'm just kidding.  I'm kidding.  Our collective bargaining units, some of the different collective bargaining units have opportunities for merit bonuses, some do not.  Exempt employees, it's not part of our financial incentive plan.

Q.      Understood.  So is it fair to say that whatever kind of COLA, percentage COLA Randy received in 2021, John probably would have received the same?

MR. MARTIN:  Objection.  You can answer.

A.      I don't know.  I'm sorry, did you say yes or no.

MR. MARTIN:  Yeah, you can answer.

A.      I would think --

Q.      Okay.

A.      -- but again, I'm not always -- sometimes I learn about the COLA when I get the piece of paper to give to the person.

Q.      Sure.  Can the COLA -- you know, this is specific for John's position, right, because it relates to his claims in this lawsuit,

98

and so I'm trying to understand how to find or who might have information about what the standard COLA would have been for John if he had not been terminated.

A.    I understand what you're saying.  I would tell you that I'm not sure it's the same between departments, I'm not sure if it's the same between people, I'm not sure if it's the same between positions, and I know it's not the same between different unions in the town.  So we have a fire union, a police union, a managers union, and they all have different mixes.  And I could not even speculate what COLAs would have been for John at that point.

Q.    Is it your understanding, though, like -- I mean, Randy's an assistant chief.  Is he part of a bargaining union?

A.    No, he is not.

Q.    Right, he's a non-union employee.

A.    Yes.

Q.    So hypothetically if Randy received a 2 percent COLA in 2021, would John, if he had not been terminated, in his deputy chief position

99

have received the same COLA?

A.    I would say there would be a very strong chance of that, but again, not being the decision maker, I'm not sure if there's more that's weighed into that or not.  I know it's not a strong answer, Greg.  I'm not involved in that part of the process.

Q.    That's fair.  So you're saying the town business office would have more information on that?

A.    (Witness nods.)

Q.    Okay.

A.    Yes.

Q.    Thank you.  And you didn't talk with them before this deposition about Topic 6, did you?

MR. MARTIN:  Objection.  I would say that's a work product issue, that's an internal communication.

Q.    Oh.  Well, let me rephrase.

Mr. Emanuel, my question is number 6 asks for information about the rate of pay the plaintiff could have received from the

100

town if he was not terminated in 2020. Before this deposition, you didn't speak to anyone to try and determine that information, did you?

A.    I looked at what John was making when he left. I did not look at anything related to John. And we don't have a deputy chief of prevention anymore. He was the last one in the line.

Q.    Okay. All right, I want to look at number 7 on Exhibit 1, communications concerning plaintiff's attempt to discuss his DISC assessment with you.

A.    Yes.

Q.    Do you recall a time in 2019 or 2020 where John provided you with his DISC assessment?

A.    I know he had left one for me on my desk, yes.

Q.    Was it e-mailed?

A.    You know, it may have been. I don't know. I haven't -- I don't have that email.

Q.    Have you searched for to see if you

101

can find it?

A.    I have.

Q.    Okay.

A.    A number of times.

Q.    But you know that John provided you with his DISC assessment around end of '19, early 2020?

A.    Yes.

Q.    Okay.  Do you know why John provided you with his DISC assessment?

A.    Yes.

Q.    Why?

A.    We had talked about trying to improve our work relations, and to expound or capture the best parts of each of our communication styles so we could work more effectively together.

Q.    Did you ever -- after John provided you with the DISC assessment, did you ever have a conversation with John about what you just mentioned, about your styles of work and communication?

A.    I know that the two of us met with

102

our coach at the time, James Rowan, and we did have conversations about that, yes.

Q.    Tell me what happened at that meeting.

A.    I believe there was more than one. At least -- at least on one of them I just -- I remember it being a closed door session in my office with -- I don't remember who was on phone or on video call.  I remember the coach asking each of us to consider what we needed to do to change or how vitally it is important or vitally important it is for us to be on the same page, to be working together, and I remember James Rowan telling John that sometimes he has to be very direct in his communications and to just be very direct in his communications, and I recall John not being overly polite or being disparaging to me about how I'm not bright enough to process what he has to say or understand what he is trying to tell me or that some of the issues that we have to talk about are so complex that my small brain couldn't understand what he had to say or that he couldn't break things into sound

103

bites small enough for me to understand.

Q.    Did John specifically say you had a small brain in that meeting?

A.    I remember that theme.  It could have been -- I would have said it was one of those meetings.  Yeah, I mean, I -- I don't think -- in the firehouse I've had a lot of people say nasty things about me.  It's not always kind, and it's my job to take the high road and let it vent, say what you need to say, and try to process the nuggets, that I can tell you're really frustrated, I can tell you don't like working with me, I can tell you don't want to take the time to listen to me about what I need or how I need it, and you're insisting that I do it your way which sometimes I can accommodate that and sometimes I cannot.

Q.    But you don't recall whether John exactly said you had a small brain or not?

A.    I didn't make that one up myself.

Q.    Oh, so you think he did say you had a small brain?

A.    I remember that theme in one of

104

those conversations because the coach was offended to the point where he said, Chief, nobody talks to you that way. I said, I would rather be direct and put it all on the table so we can understand what we're talking about. That doesn't upset me. I mean, it upsets me a little, but I'd rather have it put on the table so we can understand what we're really talking about.

Q. I want to back up. Was this a meeting with just you, Rowan and John, no one else?

A. Correct, closed doors.

Q. Got it. And was Rowan in person or by phone or video?

A. Over video. I would guess by video 'cause they usually were, but I'm not positive.

Q. Okay. Why was -- so after -- you said the theme of John's communication was that you had a small brain and you couldn't understand what John was saying. What happened after John said that?

A. We continued the conversation about what we could do to work together.

105

Q.      Yeah.  And what did that consist of?

A.      Well, I think -- I remember key points being subordinate officers have to support the fire chief, and it's the fire chief's job to set the big picture, agenda, and it's the assistant chief's and the deputy chief's job to carry out that agenda, and when they have a conflict or hit a barrier or a wall they need help with, they should come and identify the problem and identify solutions and make recommendations, so I could support John to move forward in an efficient way without wasting resources or frustrating him.

Q.      What else was said?

A.      That's the highlights that I recall.  I think we talked about accountability and owning our actions, and I'm confident one of the messages was you need to support the fire chief, and you have to work with the fire chief.

Q.      Do you recall or strike that.

Let's talk about Mr. Rowan.  What was his role with the department?

106

A.     Well, just to be clear, Greg, those messages about supporting the fire chief were from the coach, not from me.

Q.     Okay.

A.     His role was to help assess the fire department and to look for areas of continuous quality improvement that we could work on because we were a very damaged organization after the chief before me left.  And the chief before me really thrived on creating chaos and making things really personal.  He drove wedges like I've never seen driven in an organization before.  So James Rowan was hired.  He did individual assessments for all of our employees that related to our working conditions, our relationships, how we communicated, likes, dislikes so he could work with us individually on -- it was similar to a DISC assessment -- on where our strengths and weaknesses were, and his main focus was matching us up.  Understanding that we're all different but matching us up so our weaknesses could compensate for someone else's strengths or that our strength could

107

compensate for someone else's weakness.  So his company was growyourcaptains.com.  So it was focused on the officer cadre of the fire department because we hadn't necessarily been encouraged to work together as officers under the previous fire chief.  You had your shift, you go do your thing.  You had your shift, go do your thing.  And we knew that it was tearing our organization apart at the firefighter level because they really felt we needed to have things together and be more consistent.  So James Rowan did somewhere between weekly, twice monthly and monthly training with each of the companies, and we'd have a weekly video to watch and a worksheet to complete or we'd meet as a shift or as administrative staff to say I just watched that video about communication and conflict resolution, and this is what it meant to me, or you know, it made me think of this.  I wish I had done it differently.  Now I have three more tools in my toolbox.

So James had individual meetings with I believe every member of the fire

108

department, and in one of -- one of the survey rounds, we -- I think we did 360 erounds or at least the critical players, and he provided feedback to each of us saying, hey, the perception of you is this.  If that's not where you want to be, you need to figure out how to do something differently to work with other people on your team.  So it was a collaborative non-punitive tool that we had that we were trying to build relationships and understanding because we did not want artificial power imbalances or antics.  This guy was about being honest, direct and calling people out and saying did you say that, yes or no.  I said that.  That's not the way to do it.  Let's give you three different options.  What would happen if you said it differently.  That was the general theme.

Q.      In this meeting with Rowan and you and John, after you said or you thought that John's theme of his feedback was that, you know, you had a small brain and couldn't understand his concerns and Rowan mentioned that, you know, you had to support the chief, did you communicate

109

anything to John after that?

A.     I remember just trying to support him, saying, John, we got to do something different.  What can we do.

Q.     Yeah.

A.     We need to do something differently 'cause this -- I can tell how frustrated you are, and this isn't working.

Q.     What did John say?

A.     He would always ask for more time and -- more time with me, and he'd frequently say, Well, then you take care of it or I want you to prioritize my workload every day, and you tell me exactly what to do or you work with the building department or you take care of the fire alarm ordinance or the sprinkler ordinance or I need you to go do this, which he was good about identifying the problem, shaky on identifying solutions and very weak on recommendations.

Q.     You mentioned that he asked for more time with you.  Did he ever ask to meet with you just one on one?

A.     I don't recall the one on one part.

110

I know that -- you know, we -- the three chiefs were meeting at least once a week to work on workload priorities and what we could do to support each other.  And because Chief Trull had been the deputy of prevention before John, he was also a very detail-oriented person, understood the code and understood -- Randy had been a fire chief for 16 years before he came here in Berlin, New Hampshire.  So Randy had dealt with a lot of the issues we were dealing with and had far more experience than I did in that arena, and we would try to, again, compensate for each others weaknesses.  John was far better at the codes than I was.  I was always looking -- I'm looking for a recommendation.  I mean, what can I do to support you?  What do you think?  If we need to talk to the state fire marshal, let's talk to the state fire marshal.

Q.    Did Rowan ever provide a questionnaire for people to fill out.

A.    Yeah, frequently.

Q.    And when people filled them out, did they provide them to the department or to

111

Rowan directly?

A.       It was all on a website or an online platform.  So it would be electronic submissions, no paper.  And that was part of his contract.  He wasn't -- because he was trying to coach and mentor each of us, he didn't provide the Durham Fire Department with anything in writing.  You know, I don't have those.  I've never had those.  I don't have access to any of it.  You know, we'd talk in general terms.  Or, as the fire chief, you know, he'd say, you know, I think with this crew you need to -- you need to message stronger in this area.  Or this crew they don't like A, B and C.  You need to figure out how to either sweeten the pot at A, B and C or you need to change -- you need to change something with the organization.

(Whereupon, Deposition Exhibit 4, 1/17/20 email chain, Subject:  Re: Intermittent Telephone Communication Line Problem - Friday Updates (DEF 2252 - 54), was marked for identification.)

//

112

*BY MR. SILVERMAN:*

Q.      I'm sorry, I had some technical difficulties.  I'm going to share my screen. There we go.  All right.  I've put on my screen what's been marked as Exhibit 4.  This is Bates stamped DEF 2252 through 2254.

Mr. Emanuel, this is a document that the town produced, an email from John to you.  Randy is cc'd.  The first two sentences are:  "It's clear that there are communication issues.  I respectfully request that we try to isolate the root of the problem."  This email goes on, and at the end John says, "I respectfully request a meeting to discuss further so I can better understand what your expectations are."

Do you know if you and John ever had a meeting about what John may have been looking to discuss in this email?

A.      I know I've seen the email before, but I don't recall.  I need a couple minutes to refresh on what the issue was about.

Q.      Sure.  All right, let me start from

113

the bottom --

A.       Okay.

Q.       -- and I'll scroll up.

A.       Hold tight for a second here.

Q.       Gotcha.

A.       Yeah, I missed a critical step, but I'm not sure I -- I don't recall what the issue was.  Sorry.  I don't know how to answer that, Greg.  Can you scroll back down to the bottom again.

Q.       Of course.

A.       Let me start over again.  Phone line problems, E911 communication.  Fire department's working with the telephone company to ensure the problem is corrected, asks telephone customers to contact their provider directly if they experience telephone service interruptions, okay.

Todd and Jen, I'd like to submit the attached for Friday Updates.  Please contact me or John Powers with questions, okay.

Chief, I appreciate you helping by typing this out and sending.  Though I

114

respectfully ask you inform me of your decision to do this next time, as you had directed me to type something up for Friday Updates and had over an hour into a letter/recommended, okay.

John, Friday Update materials are due Thursdays at 10. This morning I was concerned with meeting the publication deadline. Had not heard from you, so I put something together in 15 minutes. I felt it was important information that was critical to share with the community. I had not seen or heard from you this morning and could not delay it being disseminated. In the future, please clearly acknowledge you are on task, update me on progress and then complete it, okay.

Okay. Chief, it's clear there are communication issues. I request to meet to try to isolate on the root of the problem. I feel acknowledging you, draft something up, was insufficient to inform you that I would take care of it.

Yeah, I understand. I don't recall if we met on this or not.

115

Q.      Okay.

A.      I would have said it aligns with the other communications that we've been having about just communicating and not knowing.  We had had a number of issues similar to this.  When the town administrator says I need it now -- I don't like to let my boss down or to underperform.  So, apparently, I took the liberty of responding within the time frame that it needed to be responded to.  So, again, I would have looked at this as I was trying to help John.  I wasn't being critical of John, and I shared with him that I did it.  You know, we had both worked here for years, and Friday Updates are due at a certain time and place, so.  I took that as a given, not -- it wasn't in.  They were calling and saying where is it.  I took care of it.  We're good.  I took care of it.

Q.      Got it.

A.      I looked at it as being helpful.  I wasn't trying to be a hindrance, one less thing.  But I understand that John was frustrated 'cause he had invested time in it which now we have a

116

lose-lose because we both spent time doing the same thing. That's no good.

(Whereupon, Deposition Exhibit 5, 2/3/20 email, Subject: DFD Annual Coaching - Employee Input Form, was marked for identification.)

**BY MR. SILVERMAN:**

Q.    Mr. Emanuel, I have shared with my screen what I've marked as Exhibit 5. This is a document Bates stamped DEF 225. This is an email from John to you. It says, "Chief, as requested, I've attached a draft copy of my self-evaluation." Do you recall receiving this email?

A.    Yeah, for the '19 evaluation. That's the one that you showed me earlier, so, yes, I reviewed that, yup.

Q.    Okay. Well, this was sent on February 3rd, 2020.

A.    Yup.

Q.    Okay. And --

A.    If --

Q.    Well, let me open this.

117

A.      Yeah.  Is it the same one we already looked at, Greg, or is this a different one?

Q.      A different one.

A.      Okay.

Q.      And I'll show it to you.  All right, did that work?

A.      I can see it.

Q.      Okay, yeah.  I'm looking at a -- at the top it says, "Durham Fire Department Annual Coaching For Performance - Employee Input."

A.      Yup.

Q.      The review date is listed as January 28, 2020.  Do you see that?

A.      I do.  Yes, sir.

Q.      Okay.  Do you recall receiving this self-evaluation from John?

A.      I do not.

Q.      Okay.

A.      But, Greg, we had as -- you know, our process for evaluations is for the employee to complete the self-evaluation, and then for us to have a meeting together.  It specifically says

118

the supervisor's not to read the evaluation.  I'm not supposed to see it until after John reads it to me and goes over it with me.  So even if I had received that, if we hadn't had the meeting, I wouldn't have read it until he reviewed it with me.  I don't recall that evaluation.  If you have a second half of it that says, And, John, here's your feedback from me, I'm sure I was dialed in.  If I don't have the second half, I don't recall doing the first half.

(Whereupon, Deposition Exhibit 6,

1/29/20 email, Subject:  Re:  2019 Annual

Self-Evaluations, was marked

for identification.)

**BY MR. SILVERMAN:**

Q.     Okay.  Let me show you what I've marked as Exhibit 6.  All right, so this, and I'll start from the bottom.  This is an email from you, or let me just -- this is Exhibit 6, Bates stamped -- it's hard to see the first page.  The second page is DEF 659.  It looks like this email chain starts from you, asking Randy and John to complete their 2019 self-evaluations and

119

give them to you by February 4.  Do you see that?

A.    I do, yes.

Q.    Okay.  So you asked John to provide you a self-evaluation and give it to you, right?

A.    Yes.

Q.    Okay.  So this wasn't necessarily following the policy for self-evaluations?

A.    I wouldn't agree with that because I wouldn't have read it until John went over it with me, as I had described.

Q.    Well, I think you just testified earlier that John sending you the evaluation was not aligned with policy, right?

A.    Let me clarify my statement.

Q.    Please.

A.    I wouldn't have reviewed it until after our meeting, and I know that sometimes we meet different carets or different benchmarks or different dates, and said get it done by this date so then we can meet on it would have been the intent.

Q.    Fair.  Did you ever schedule a date to review John's self-evaluation?

120

A.    I have no idea.

Q.    Okay, I'm going to -- Mr. Emanuel, I shared my screen.  I've shared what's been marked as Exhibit 7 in Mr. Powers's deposition, Bates stamped, the first page at the bottom, DEF 18.  Do you recall seeing this email?

A.    Yes.

Q.    Okay.  Did you ever talk with John about this email?

A.    I think we talked about it some.  I don't think we -- I don't believe we ever resolved the issues.

Q.    Okay.  Do you recall -- do you have a specific recollection of speaking with him about this email?

A.    No.  Not for a complete resolution. Like I said, I think we spoke about it several times in passing, about what the three of us can do to support each other and figure things out, but telling me to take care of his project wasn't the solution.  I couldn't do that.

Q.    When you say the three of us, you, Randy and John?

121

A.    Yes.

Q.    Okay.  At the end of John's email, he says, "I respectfully request that we meet as soon as possible in this business week to discuss how or if we should move forward with this project."  Do you know if you ever had a meeting about this project?

A.    I do not recall having a specific meeting dedicated to that, other than saying, John, that's not an option, that we have to do better than that.

Q.    Okay.  I'm looking at the bottom of Page 1.  John writes:  "As I tried to explain today after a phone call with James Rowan, this job is hard enough because nobody wants to do it. It is truly the redheaded stepchild of the fire service."  Do you see that?

A.    I do.

Q.    Okay.  Do you recall John saying that?

A.    John would say that frequently, if not daily, yes.

Q.    Okay.  All right.

122

A.        Yeah, I think he really felt as though it was a position of -- he felt other people viewed it as a position of diminished importance and didn't add value, and we disagreed on that because if that were the case it wouldn't have been an office funded with three people with full support of the fire department --

Q.        Great.

A.        -- if we didn't agree on that position.

Q.        What was this ordinance issue about?

A.        I'm not even positive which one that was, Greg.  Could you put it back up again for a second?

Q.        Of course.

A.        It was either sprinklers or fire alarms.  I don't --

Q.        Well, let's talk about both.  The sprinkler ordinance, what was going on there?

A.        We were trying to do a rewrite, and there was friction between the fire department and the code enforcement office about how it

123

should be done or what the language should be.

Q.    Yeah.  Was that a recent project or had that been ongoing?

A.    No.  It was a legacy project that had been started and stopped between John's first tenure and second tenure.

Q.    What was the friction between the fire department and the building office?

A.    I believe it would have been communications about language and definitions and just disagreeing with -- general disagreement.  I remember my interpretation was a lot of the general disagreement went back to making things personal or about character, not about the issue because we all want what's best for the Town of Durham.

Q.    How about the fire alarm ordinance, what was that about?

A.    I don't even recall.

Q.    Okay.  And do you know if that was a new project or a legacy one like the sprinkler?

A.    Sorry, Greg.

Q.    That's okay.

124

(Whereupon, Deposition Exhibit 7,

2/14 20 email, Subject Insights

Assessment/DISC Assessment from Primex,

was marked for identification.)

**BY MR. SILVERMAN:**

Q.       All right.  Mr. Emanuel, I have shared my screen.  I've marked a document as Exhibit 7.  It's Bates stamped at the bottom as Defendants 523.  I'll note you're not on this email.  It looks like an email from John to James Rowan.  Have you seen this email before?

A.       I have.  This is what showed up when I -- when we looked for John's email to me, this is the only one that we found.

Q.       Got it.  Had you ever talked with Rowan or strike that.

Did Rowan ever talk with you about receiving this email or about John's DISC assessment?

A.       I don't recall.

Q.       When you say you don't recall, does that mean it could have happened, it might not have, you're just not sure, or you don't think it

125

did?

A.    No, I'm not sure.  My guess is it did.  I mean, I know I'm not supposed to speculate.

James Rowan conducted his own assessments which were remarkably close to the DISC assessment.  I'm confident that if John sent it to him he got it, and I'm confident he would have reviewed it.  I just -- whether you call it an analyzer or a blue or a square or a triangle, I don't remember which, how all the different assessments overlined or overlapped, but I think James Rowan had a pretty good handle of what each of us did well and didn't do well.

Q.    Yup.  You mentioned Rowan did his own assessments.  Were those in writing?

A.    They were electronic.  We talked about it being a computer-based online questionnaire, yes.

Q.    Did Rowan ever do an assessment of John?

A.    I think he did everybody in the fire department.

126

Q.      Do you know if that was provided to -- were Rowan's assessments provided to the person he assessed?

A.      I know he reviewed them.  As I said earlier, his contract with us was he didn't provide paper to the fire department.  So we would have a video conference call very much like this, and he would share his screen very much like this, and review the results of whichever survey or feedback instrument it was with each of us, very much like you're doing right now.

Q.      Got it.  Do you recall if Rowan ever did a presentation about his assessment of John?

A.      I know that there were several people that were resistant and didn't want to work with James Rowan.  I don't remember if John was one of those people at the beginning or not. I don't recall.

Q.      Was John ever resistant to working with James Rowan?

A.      I believe he was.

Q.      And what's the basis of that

127

belief?

A.    I remember James trying to track John down.

Q.    And?

A.    It took more effort than it did with the rest of our staff.  That's all I remember.

Q.    But do you know if John eventually spoke with Rowan?

A.    I know that John, James and I spoke a number of times.  I don't -- I don't know -- I don't recall if --

Q.    If Rowan and John ever spoke?

A.    I was led to believe that James had talked with everybody at the fire department.  I don't -- my goal is for group improvement.  This was not a why didn't that person talk to you kind of deal.  This was a value added or a gift to help each of us improve.  So, you know, I embrace learning opportunities.  I embrace the gift of self-reflection.  If somebody's going to tell me something that I might not know, I want to hear it because that's how I grow and develop

128

professionally and as a leader.  So I do know there were people on our staff that embraced it and other people dismissed it all together and said this guy's wrong or you're wrong or you're wrong.  I know best, that's all there is.  That's human nature.

(Whereupon, Deposition Exhibit 8, 2/26/20 email, Subject:  Chief's Roundtable - Coordination, was marked for identification.)

**BY MR. SILVERMAN:**

Q.      Mr. Emanuel, I've shared on my screen a document marked as Exhibit 8.  This is Bates stamped at the bottom DEF 642.  The subject line is Chief's Roundtable Coordination, and in it, it says "Weekly Coordination meeting with Emmanuel, Trull and Powers."  Do you see that?

A.      I do.

Q.      My question is, you had weekly meetings with yourself, Randy and John; is that right?

A.      That is correct.

Q.      When did those weekly meetings

129

begin?

A.      It was -- I don't recall.  We had identified it as an area for improvement when John came back, you know, with the three of us working together.  We said we need to improve our communications and increase our communications, so we scheduled weekly meetings.

Q.      Did these weekly meetings start as soon as John was hired back in his second stint?

A.      I would have said it was close to that, but I don't recall when we started the meetings.

Q.      Okay.

A.      I just looked at it as a way to make our team stronger.  You know, sometimes it would be -- we went from me sticking my head in everybody's door to see how they were doing to, you know, we'd talk in the hallway to we finally said whatever morning this is, every Monday or Tuesday or whatever morning, we're going to do a coordination meeting.  So we tried to formalize the process.  And if we didn't, I would -- our jobs are so dynamic, I wouldn't plant my butt in

130

the seat and do it, so we tried to formalize it so the three of us could put it on our calendars and do our best to not book that time for someone else.  But I will also note that, you know, I -- I know that at the beginning, you know, we were cognizant of when John's therapy appointments were, so we made -- you know, that's not going to work, pick a different day.  So we'd move the coordination meeting to accommodate whatever standing appointments people had.  And, you know, John had regular meetings also, whether it was the technical review group, whether UNH with the fire marshal's meetings.  I mean, we all had standing appointments, so we would try to pick something that didn't overlap with everyone's standing appointments where we could sit down and do this.  And I also note that there were a number of meetings that John just wouldn't attend, so, you know, our weekly coordination meeting just turned into time with me and Randy doing our business because 'cause John was not present which was problematic because we all agreed that was the time we were going to do it.

131

I need all three of us in the room together.

Q.    Yeah.  Did you ever talk with John about that?

A.    Yes.

Q.    And what was John's response?

A.    I had something else to do or this was more important or.  I don't remember him saying -- yeah, I don't remember anything solid. I just know that we had the conversation a number of times.

Q.    Was there anyone else in the Durham Fire Department who saw a therapist on a regular basis like John?

A.    I would say that I'm not privy to that but --

Q.    You don't have to name names.  I'm just curious if you know of anyone else.

A.    Oh, then yes.

Q.    Oh, okay.  Yeah, how many -- how many other people about?

A.    I would say between one and three.

Q.    Okay.

A.    Okay.  Like, if I were going to go

132

and ask right now, some people would be like of course I do, and some people would be like you shouldn't be asking that question.

Q.    Yeah, fair.  I was just curious about anyone else besides John being open about it.

A.    Fair enough.  I mean, don't get me wrong, Greg, at this point in time I think the town had either two or three EAP programs, and I was seeing someone as well, so I would say commonplace and accepted.

Q.    Sure, absolutely.

(Whereupon, Deposition Exhibit 9, 2/20/2020 memo to the File from Dave Emanuel, was marked for identification.)

**BY MR. SILVERMAN:**

Q.    Okay, Mr. Emanuel, I want to go and talk about Topic number 8.  This is the preparation of communications concerning the performance improvement plan provided to plaintiff.

I have marked as Exhibit 9 a

133

document Bates stamped DEF 279 through 284.  This is -- it looks like a document you wrote to the file.  It's dated February 20, 2020.

Did you -- and I can scroll and have you read through it, if you want, and we can -- I want to ask questions about the contents, but do you remember writing this document?

A.    Yes, I prepared that document.

Q.    Right.  Why did you prepare it?

A.    I was trying to put my notes and key points in order so I could keep them straight so I could succinctly communicate to John what some of our conflicts were and the best ways that I thought we could work together to resolve them. So this was a preparatory document that -- these are my notes.  This isn't a document I would share.  I would not have shared this with John. This would have been my homework so I could succinctly articulate areas that we need to work on together.

Q.    Okay.  I'm going to go through it a bit.  Do you think you prepared this on February

134

20?

A.    I don't know what date.  I would tell you that a multipage document like this would have been put together over a period of time.  So I don't know whether it was the 18th and the 20th.  I don't know what the time frame was.  But I know that with all the different things that pull at me to find the time to put this together wouldn't have been one sitting.  It would have been nights, weekends, holidays or between projects I would sit down and say I got to think straight, put all the pieces together so we can look at it and boil it down to the key points.

Q.    Okay.  When you prepared this document, had you met with John just one on one the two of you at this point?

A.    I don't recall.  Usually it was three of us that would meet --

Q.    Okay.

A.    -- because sometimes John would be frustrated with just me.

Q.    Okay, I'm going to scroll down.

135

Okay, this last paragraph at the bottom of what's been Bates stamped DEF 280 starts: "As recent as this week, I noticed you walking down the front hallway with your head down when you arrived at the station around noontime. You did not say good morning or acknowledge with me or the admin staff that you were in the building." And it says, "You and I have discussed this concern a number of times before." Can I ask you, just to zoom out, had John expressed this kind of behavior in his first stint at the firehouse?

A.    I would just said similar. I think that that's fair 'cause I know he didn't like the fire chief.

Q.    Okay. So did you interpret this behavior by him to mean that he was upset with you?

A.    I didn't know how to interpret it. I just knew that -- you know, we had an intercom system in the fire department, and it's really easy to say, Deputy Powers, I got a line on -- I got a phone call on 1246, and so the administrative staff could forward a phone call

136

to John if he was on his desk or just buzz it to his desk. And by not acknowledging that he was in the building, it would make it really difficult for anybody on our staff to say either get up and go around the corner and find John or John's not here. So I can't -- I'm not sure exactly what it was. I know that he didn't -- I know that he didn't have a strong relationship with the administrative assistant that was trying to help the fire prevention bureau. So, you know, if you don't like somebody, maybe you don't walk by their desk. So he would seldom walk in the front door and acknowledge to our administrative staff that he was here. And when he came in the backdoor, you know, just -- I don't think he was communicating with me or Randy well that, hey, I'm in the building if you guys need anything. And just, again, in a team environment, you have to do that kind of stuff.

Q.    Mm-hmm.

A.    And I guess I was bringing it up because, you know, I care about him, and I'm trying to help him understand that his actions

137

are interpreted by different people in different ways. I mean, one of the administrative assistants left our organization, and one of the reasons she cited leaving was because she didn't like the way she was treated by the fire prevention deputy. For me it's not a John issue that just impacts John. This is impacting our whole organization.

Q.     Did you have any thoughts about whether this reaction or maybe this behavior that you noticed from John was related at all to his PTSD or maybe the way he reacted when stressed out?

A.     Yes, and he didn't -- I don't think he had a great way of managing conflict or stress. And I knew he was working on it with someone every week. So when somebody has their own lifeline and network and system established, you know, you say, you have your thing, if you need something different, let me know, or if there's something different that we can do to offer it to you, let me know what it is.

Q.     Did you -- well, strike that.

138

The sentence that starts with "You and I have discussed this concern a number of times before," and it goes on to say, you know, you expressed your expectations.  Do you recall when you communicated with John about this?

A.    I would have said it was multiple times.  It was before the driving incidents.  You know, a front office staff is not trained in personnel issues.  They're not trained in managing or leading.  They're administrative assistants, and they take this kind of behavior as offensive or they take it really personally that somebody won't talk to me.  So I'm confident I said, John, when you do this, it makes this person feel like you don't like them or like they did something to you and you're retaliating or.  No, I just -- I know we've talked about it a number of times, and I don't know whether it was over the fall or the spring.  And I don't remember when it started but something -- something was going on.

Q.    Yeah.  What was John's response when you approached him about this?

139

A.      I don't remember.  I think he would either deny it or have a reason why he was doing it.

Q.      Do you recall what he said was the reason why he was doing it?

A.      Yeah, he shouldn't have to check in with them, they're not his keeper.  Or he doesn't have to check in with me, I'm not his keeper. Or, you know, that kind of -- like, I'm not asking anybody to track you or keep track of you. I'm just asking for your help so when people -- when you're in the building or if you're available, just tell us, and they'll send in the call or they'll bring in the person who needs to see you, or they'll ask you if you have time to deal with something.  We just -- we cut all the messages, the emails and the texts out of it and just say, Hey, do you have a second, yes or no? No.  Okay, move on.  Yes, and then you've resolved another issue, it's behind you, and we weren't good at resolving issues.

Q.      So you thought when you brought this up with John he got defensive?

140

A.      I'm confident at least some of the times he did, yeah.  I mean, we all have off days.  So, I mean, sometimes, like, John, I'm sorry, you're having a bad day.  I'll stay out of your hair.  Or if there's anything I can do, do you need -- what can I do?  Do you need me to go to something?  Do you need me to talk to someone?  What can I do?  So for a period of time I thought the support network worked well within the firehouse, but there was a point where something had changed.

Q.      I'm on the top of Page 3.  This starts talking about the proposed sprinkler ordinance, and it says, "I notice that you sent it to me as I was preparing to leave on January 30, 2020."  Where were you leaving to?

A.      I'm not sure.

Q.      Okay.  I want to ask about -- we've talked about your role with the International Association of Fire Chiefs bullying committee, right?

A.      Yes.

Q.      Did you ever travel for that

141

committee?

A.      Yes.

Q.      About how often?

A.      It's different from year to year. You know, we were presenting on the national stage at one or two times a year, and at that point in time, we were trying to get a program developed, so, you know, there was committee work where we would meet in a central location across the country or that they, the board of directors for the International Association of Fire Chiefs, would say we need you to come down and provide information at a board meeting.  I don't know. It was time to time.

Q.      Okay.  Like, if you had to average, was it once a year, three times a year?

A.      Well, we were presenting at an annual conference at least once a year, and I would say when we were -- this time we were probably meeting once or twice a year.  So, you know, three, four times a year.  Three times.  I don't know.  But they were usually, you know, colocated with other programs, you know, other

142

professional development conferences or other destinations, so.

Q.      Okay.  But that would involve you leaving the firehouse?  These weren't on Zoom or anything, right?

A.      You asked me when I was leaving. What I'm describing is when I was leaving.  Yes, I was leaving Durham and having -- yes, I would notify the fire department that I would be traveling for this many days, and there's an acting chief in place, he's your go-to person, yes.

So just to be clear, when I travel, if I'm going to be gone, I appoint someone to be the acting fire chief to address questions, comments and concerns and to make decisions on my behalf while I'm away.

Q.      Sure.  Were there any other organizations or things you were involved in around 2019, 2020 that made you leave -- made you travel and leave the firehouse?

A.      Yes, Greg.

Q.      Well, let me strike that.  Let me

143

be more specific.

A.      My mother-in-law's in Pennsylvania, so, you know --

Q.      That's fair.

A.      -- absolutely.

Q.      Let me ask that again.  Any other organizations or groups you're involved with that led you to leave, essentially out of town travel, that was related to your job as chief, like the bullying committee?

A.      On that level of magnitude, just attending or speaking at conferences and working on professional development.  We encourage our full staff to participate so we are on the cutting edge and contributing to growth and professional development on the fire service.  I was active in the mutual aid district, and I was active in the State Fire Chiefs Association.  Not always to the same level John was because, you know, we had work to have him appointed to state boards and commissions.  I wasn't sitting on state boards and commissions at that point, but I was involved with the organizations, yeah.

144

Q.        And that would require you to, I guess, multiday travel and leave the firehouse?

A.        No.  No, generally not.  I mean, the seacoast chiefs meeting would be in Exeter or Hampton or Portsmouth, and the state chiefs meeting is in Concord or somewhere else in the state.  I would not be appointing an acting chief if I'm going to Concord for the day.  I think that the town policy is if I'm gone for I think it's four or five days you can have an acting -- I can appoint somebody and pay them as an acting officer or acting chief, but usually if I was gone for more than a few days that I would do that.

Q.        And before you provided John's performance improvement plan, you and Randy planned to travel somewhere; is that right?

A.        Yes.  That was --

Q.        Where were you going?

A.        We were going to Florida for the Center For Public Safety Excellence -- excellence conference which was an annual program that I'm not sure that I've been to before.  Oh, maybe

145

I've been there once. That was a week long or a three- or four-day long program with the national organization that does professional credentialing for individuals and certifications or. Not the word certification but credentialing for accredited agencies. Agency accreditation, that's the word I'm looking for.

Q. Got it. You mentioned you speak at conferences. What conferences are those?

A. That year I spoke at the CPSE or the Center For Public Safety Excellence, and I'm confident I spoke at the IA -- the International Association of Fire Chiefs, Fire-Rescue International.

Q. Was that related to the bullying committee or something else?

A. I speak on a number of things. Bullying is one of them. Toxic workplaces -- toxic workplace environments and leadership, continuity of operations planning. General leadership topics.

Q. Do you travel to do those presentations?

146

A.        Some of them, yes.  Some of them, no.  Some of them are online, some of them are prerecorded, and some are with life audiences.  All of the above.

Q.        Mr. Emanuel, on Exhibit 9 I've highlighted in the middle of the page where it says, "Assistant Chief Trull and I have discussed the negative impact that your limited time at the fire station has had on each of us, and I want to ensure that you understand that it is not helpful to the fire department."  Do you see that?

A.        I do, yes.

Q.        Okay.  When do you recall that you and Randy discussed this with John?

A.        Ooh.  I would have said we talked about it at coordination meetings from time to time because we had been trying to make sure we had overlap to communicate and resolve issues.  I can't give you specific dates.

Q.        Okay.  And --

A.        Well, actually, I should say Assistant Chief Trull is very sensitive to someone else managing his time or he would be

147

really upset quickly if he felt he had to do my job or John's job because we weren't doing it. So at that point, I was trying to manage two different personalities who looked at things very differently and to get the best work product out of the three of us.

Q.   Sure.  When you say you discussed the negative impact that it has had on you, how would you summarize that?

A.   Randy would tell me he has too many things to do, he can't afford to be doing John's work.  He can't afford to be taking John's phone calls.  He can't afford to be doing the research or the enforcement.  I would get a lot of blow back on that side.

Q.   From Randy?

A.   Yes, and specifically with the inspectors.  Because Randy had been the deputy before John came back, the inspectors would -- and if John wasn't around or they just couldn't communicate, they would go next door into Randy's office and say, Randy, how do you read this? Randy, can you help me understand how this works?

148

Randy, I need you to do this for me because I need some direction. So it wasn't always me, but it was part of our team.

Q. Yup.

A. Or paralyzing inspectors because they just need a yes or no, and they'd say, Well, John I sent you an email, and John would say, Oh, I get hundreds of emails a day. I'm answering them in order. I'll get to yours next week. And sometimes that works and sometimes it doesn't.

Q. Sure. I'm going on to the next page. This is Paragraph (g) on Page 4 of the exhibit, and that second sentence says that you're concerned that you are overextended at work and that the stress is impacting your job performance. Did you ever tell that to John, that you thought he was overstressed at work?

A. Yes.

Q. And what was John's response?

A. Too much work.

Q. Yeah. Did John have any suggestions about what might help alleviate that stress?

149

A.    I should do more of it.

Q.    That you should?

A.    I should take on the sprinkler project; I should take on managing the building department.  I should.

Q.    Mm-hmm.  Did John have any -- did he ever express that he was having difficulty dealing with certain individuals and that he needed you to maybe step in on a specific issue with him?

A.    He did.

Q.    Do you recall who he mentioned?

A.    I recall the building -- the code enforcement officer being one of those people.

Q.    Okay.  And was there a specific issue that John requested your assistance with?

A.    General communication.  He didn't like this person, and he represented that this person didn't like him, and they couldn't work on things together or have rational conversations.

Q.    So it's your testimony that John said you just need to talk with them instead of me, like from now on?

150

A.        I'm not sure I understand your question.

Q.        Let me ask it again.  I mean, did John ever come to you with specific -- at specific times saying I'm in a log jam on this specific issue, and I'm butting heads with so-and-so and I need your assistance on this specific topic?

A.        Yes.

Q.        And how did you respond?

A.        You showed the email a few exhibits ago.  We never finished resolving it.  John left the organization before they were resolved.

Q.        Right.  I'm showing you Exhibit 4.

A.        That wasn't one of them.

Q.        That wasn't one of them?

A.        No.  That was he didn't like the fact that I -- he didn't like the fact that I replied to my supervisor in a timely manner because the fire department did not.  That was the issue of this email.

Q.        Right.  I'm showing you what was marked as Exhibit 7 at John's deposition.

151

A.        Okay.

Q.        Are you referring to this one?

A.        I think so.  I want to say, yeah, from the middle of the page or the bottom. Wherever you saw Audrey.  I also discussed things with Audrey to clear it through Todd's email, and she's talking behind my back --

Q.        Mm-hmm.

A.        -- and speaking to Brendan.  I think it's the next page.  He says I need you to take care of the -- yeah, I'm not seeing it in this one.

Q.        Well, in this one John says, "I respectfully request that we meet as soon as possible next business week to discuss how or if we should move forward with this project."  Do you recall if you ever had a meeting about this with John?

A.        I do not recall.

Q.        All right.  Maryellen, can we go off the record, and can you say the time before we do.

THE COURT REPORTER:  We are going

152

off the record at 12:22 p.m.

(A break was taken from 12:22.

to 1:00 p.m.)

**BY MR. SILVERMAN:**

Q.      Mr. Emanuel, we're back on the record.  I've got a couple more questions about what's been marked as Exhibit 9 on my screen. I'm looking at Page 5 of Exhibit 9, Paragraph V where it says, "I understand that personal attitude is difficult to change and that you have described your doom and gloom output to Assistant Chief Trull and me regularly at our weekly meetings."  Can you tell me how John described his doom and gloom outlook?

A.      I would say that John described it as having a doom and gloom outlook.  He would often focus on the challenge or the worst case scenario or the parts are black and white and sometimes we couldn't change, and I think he bore a heavy burden by that and yeah.  Instead of looking at a desk or a workload and saying I can do A, B and C today, he would often look and say I can't do Z through D and this is no good.

153

Q.        Yeah.  Did he ever ask you for assistance with prioritization?

A.        Yes.

Q.        And when he did that, did you discuss that with him?

A.        Sometimes.  Sometimes we would -- he would want prioritization for which emails he should answer first, you know, out of his numerous emails, and John, I can't -- I can't function at that level of your desk, your daily workflow.  In terms of prioritization of larger tasks or functions, yeah, I would say this is important to the Town of Durham, the town administrator's office, the planning board or code enforcement or UNH.  Of these four things, this is the highest priority down to the least priority.  And we talked about that every week in our weekly coordinations meetings, again, to say if we have to give something up, what are we going to give up.  Or we know we're out staffed to fix all of this today, Randy, what are you going to do; John, what are you going to do; and what can I do to support you guys and which one

154

am I going to do.  So we talked about that every week.

Q.        Can I ask you in the first -- in John's first stint at Durham, did you observe John or did you ever talk with him about having a doom and gloom outlook?

A.        I would say in general terms when we were out and going for walks or just checking on each other's health and safety, yeah, I'm confident that that theme was present, yeah.

Q.        And did you talk with John about potential strategies on how to get past that or move beyond it?

A.        I think so.  Just getting back to positive energy and focusing on the things that we can change and effect and recognizing the things that we can't and letting them go.  Just got to move forward.  Don't always look back and -- don't always assume the worst because even though I didn't like the guy that I was working for at the time, there's nothing about him that I could change, so I did need to change what I did to work with him or how I performed so I could

155

hit critical benchmarks that he put out for me.

Q.      Fair.  Did John ever talk to you about his tendency to ruminate on certain issues that might have prevented him from moving past his doom and gloom outlook?

A.      When you say the word ruminate, I would say that John has definitely put it in those terms before, but I don't re- -- I don't recall a lot more than that.  You know, we spent a lot of time about he'd process something to his own demise and ruminate's a good way to describe that.  I was not successful in helping him get past that bridge or across the next river.

Or I guess I would say to the point where through both of his employments sometimes the conversation would reflect on something that happened 10 years ago, and that hasn't happened since the last guy left.  We're past that.  And John would still be upset about something that Chief Landry had said or done, and I'd say I can't undo the past.  There's nothing I can do about that.  We just need to move on.  And to the point where he'd get so hyperfocused on

156

something.  Again, it could be paralyzing.

Whether it's the topic or the person or -- just

it was paralyzing for him.

(Whereupon, Deposition Exhibit 10,

2/27/10 email, Subject:  Chiefs Meeting,

was marked for identification.)

**BY MR. SILVERMAN:**

Q.      Okay.  Mr. Emanuel, I've shared my

screen.  I've marked this as Exhibit 10.  It is

Bates stamped at the bottom DEF 641, and it looks

like a calendar notice for February 27, 2020.  Do

you see that?

A.      Yes, I do.

Q.      Okay.  This is the meeting that you

communicated your performance improvement plan to

John, correct?

A.      Yes, that sounds good.

Q.      Okay.  Did John know that he would

be receiving a performance improvement plan at

this meeting before it happened?

A.      He did not.

Q.      Why not?

A.      When we'd had similar conversations

157

before, if we said, John, I need to talk to you about something that's going to be uncomfortable, John would call out sick or not come to work or something else would get in the way and we wouldn't be able to have that conversation.

Q.    So you felt like not providing him notice was the only way that you could have this evaluation meeting?

MR. MARTIN:  Objection.  You can answer.

A.    No, I don't feel that way.  I feel that if we wanted to -- I know that if John didn't want to talk about what we needed to talk about, he wouldn't come to the meeting.  It had nothing to do with the performance improvement plan or a diff- -- it had to do with a difficult conversation.  It didn't matter what the topic was.  If I said we need to talk about the sprinkler ordinance or the building inspector, if John wasn't prepared to talk about that for whatever reason, he just wouldn't show up, and it would take another day or another week to resolve the issue or we'd never resolve the issue because

158

he just wouldn't -- I couldn't influence his behavior to show up and be present all the time consistently.

Q.    So you thought that if you had told John that you were going to give him a performance improvement plan ahead of a meeting where you would do that, he would have not shown up?

A.    Yes, that's correct.

Q.    Have you ever done a similar thing before where you wanted to have a difficult conversation with John and didn't tell him ahead of time that that's what you wanted to talk about?

A.    I think most of the sit-downs we had were either tagged onto another meeting or when the three of us were available.  I don't know that I ever gave him notice that we're going to talk about these three driving complaints or we're going to talk about the emails that you're sending that are out of line.  I don't think I specifically said this is what we're going to talk about because we just -- we could deflate

159

the emotional bubble if we just sit down and have a conversation.  Sometimes John would get worked up about what his perception of the problem or the punishment was even if there was no problem or punishment.  It just -- it wasn't fair to John.

Q.      We talked about how earlier John's -- I think you testified John's DISC assessment showed that he was a planner, right?

A.      Yes, yes.

Q.      But you didn't think that John would want to plan for an evaluation meeting where he would receive a performance improvement plan?

A.      I don't think there's any planning required to sit down and have a conversation.

Q.      Well, we looked at earlier where your evaluation of John in March 2019 said that he was impacted by conflict, right?

A.      Yes.

Q.      And he was adverse to having difficult conversations with staff?  Do you remember that?

160

A.       Yes.

Q.       Okay.  So how did you think that John would react with a performance improvement plan that he wasn't aware of?

A.       I expected a one-way conversation where I could review the paper, give it to John and say let's talk about it next week.  Go process it, but I got to talk to you because I'm not going to leave a piece of paper on your desk.

Q.       Sure.  All right, so let's talk about what happened at that meeting.  So you, Randy and John show up, and then what happens?

A.       It was a very brief meeting.  I said, John, we got to have a difficult conversation.  I need to review the document with you, and I said I'd like to read it to you.  I'll give you a copy of it.  And in the first couple of lines John said, I can't -- I can't do this, I can't do this, and I got to go.

Q.       And how did you respond when he said that?

A.       I think I said, John, can I just -- can I just read it to you and give it to you so

161

you can take it, take the document that is, and go reflect on it, process it on your own.

Q.   Yeah.  And what did -- how did John respond when you said you wanted to read it to him?

A.   You're making me physically sick or I feel like I'm going to be physically ill and I'm going home sick.

Q.   Okay.  Did he ever ask you to stop reading the document so he could review and talk about it later?

A.   He did.

Q.   And how did you respond to that?

A.   I think I said, Ah, I just -- I want to go over this with you, and then I want to give you the piece of paper so you can review it later.

Q.   And then you kept reading?

A.   Well, I asked if I -- yeah, I was, like, let me just review it with you and then take it 'cause I'm not going to just leave the piece of paper on your desk.

Q.   But it's not --

162

A.       It's not how you resolve conflict.

Q.       Sure.  But isn't that what John requested, that you stop reading so he could review the document and then talk about it with you later?

A.       He did request that, yes.

Q.       But you didn't want to say okay to that, right?

A.       I didn't really have a choice.  He turned around and walked out the door.

Q.       Did -- well, let me ask you this, how far -- strike that.

You read most of this performance improvement plan to John at the meeting, right?

A.       No.

Q.       How far along did you get?

A.       I'd have to look at my notes.  My guess is I got a couple sentences.

Q.       Oh.

A.       I'm not sure I made it through the first paragraph.

Q.       So it's your testimony that or strike that.

163

At this meeting, did John ever ask you if you had read his DISC assessment that he provided you?

A.      I don't recall.  I hadn't dug back into it.  So if he had, I would have said that's -- it's not relevant to this conversation.

Q.      And why didn't you think it was relevant?

A.      'Cause I needed to have a chief-to-chief conversation with our deputy chief.

Q.      But just to clarify, at this time Randy was in the room, right?

A.      Randy was in the room, yes.

Q.      Did John ever say that he was becoming extremely upset or over-agitated and needed to excuse himself?

A.      During this meeting or are you talking in general?

Q.      During this meeting?

A.      During this meeting, yes, and then he walked out the room, out of the room, shut the door.

164

Q.      Did John ever show you that his hands were shaking during this meeting?

A.      I don't recall.  I'm confident by that time my hands were shaking because I didn't want to have this conversation either.  I think it was uncomfortable for all three of us.

Q.      Yeah.

A.      I don't -- I don't like having these conversations either, and you know, everything we were doing we were trying to set each other up for success, not for failure.  I planned on talking with my staff or our staff to say, guys, we got to tighten some stuff up.  This isn't about me.  It's about us.  And these are things -- John, we need to work on these things, and I was not permitted to have that conversation.

Q.      Just to clarify, you began the meeting or a conversation about the performance improvement plan by reading it verbatim, right?

A.      I would have been, yeah, reading it, yes.

Q.      Okay.

165

A.        I mean, is that how we began?  I probably had an introductory statement like, John, I need to share a document with you or I need to go over something with you, here's your copy.

Q.        And then you began reading?

A.        Yes.  Yeah, it wasn't -- there were no flowers on this meeting, and it was we just -- we got to do some business.  Just take a breath.  This is not all bad.  'Cause John always -- John frequently assumes the worst of everything, and this wasn't the worst.  It was just these are some things we need to work on.

Q.        All right.  I'm going to -- you referenced your notes.  I'm going to show them to you.

A.        Yes.

Q.        Okay.  So this is what's been marked as Exhibit 9 of Plaintiff's deposition. So is this document an accurate reflection of what happened at this meeting?

A.        I believe that it is, yes.

Q.        And you prepared this?

166

A.        I did.

Q.        Okay.  I want to look to this sentence that I'm highlighting here at the bottom of the page where it says "Emanuel asked to read the memo in its entirety and stated that he did not need a response today."  Do you see that?

A.        I do see it.

Q.        When providing -- we talked earlier about self-evaluations, and I think you testified that the policy is that for an employee self-evaluation they're not to read the memo or give it to the person but rather to talk with them about it; is that correct?

A.        That is correct.

Q.        Okay.  So why did you choose to read this memo?

A.        'Cause -- well, a similar format. We're going to have a conversation, and the best way for me to say the same thing every time and be consistent is to just read the memo.

Q.        Well, why is it -- why is it not the policy in a self-evaluation for the employee to read the memo?

167

A.        Well, Greg, maybe -- maybe I misused words.  When you follow the directions on the evaluation, the employee's supposed to read the self-evaluation to the supervisor and talk about it.  The supervisor is then supposed to read the response and talk about it.  So maybe I made an error by giving John the piece of paper, but as a professional courtesy, I thought it was in my best interest to say, John, I'm going to go over this with you, here's a copy for you.  This is not -- you've got full disclosure on everything we're going to talk about.  I just want to read it to you.  Am I not making sense or not answering your question?

Q.        Well, let's take a look at what I marked as Exhibit 6.  This is an attachment to Exhibit 6 which is the DFD guide Coaching For Performance.  Let me share that.

Okay.  So this says with an evaluation there's supposed to be two meetings with the supervisor, right?

A.        Greg, you're looking at an annual review document.  I was not giving John an annual

168

review document.  I'm not sure what the direct connection is for these.

Q.      Well, I'm just -- I'm interested in the difference between what this document seems to suggest and what happened at the meeting. Right?  So --

A.      I was not giving him an annual review document.  You're looking at the guidelines for our annual review process.  I was not giving John an annual review.  There's nothing, there's nothing -- there's no correlation between them.

Q.      Well, isn't a performance improvement plan like an evaluation?

A.      No.

Q.      So you're not -- when you give someone a performance improvement plan, you're not evaluating their work?

A.      I'm providing feedback, but it's not part of this annual process.  It's completely a separate animal.

Q.      Right.  I'm just trying to understand why the conduct in the February 27

169

meeting didn't necessarily follow what is stated here which says --

A.      Oh.  Sorry.

Q.      Right, right?  So let me -- again, let me just look at the second paragraph, right?

A.      Yeah, yeah.

Q.      And I'll highlight it for you. "During the meeting, use the form as a reference and share your information orally.  It is important that you do not give the supervisor the form in advance of the meeting or at any time during the meeting.  He/she should hear the information directly from you and not be reading ahead."  Greg, do you see that?

A.      I do, absolutely.

Q.      Okay.

A.      And, Greg, I didn't think it was appropriate for me to bottle this issue up until John's annual evaluation.  I had to -- this was a realtime issue we were trying to address that had nothing to do with his annual employee and supervisor coaching document.

Q.      Understood.  Just to clarify --

170

A.        I'm just trying to make sure you know that it would be inappropriate if I waited for John's annual review to do that with him.

Q.        That's fair.  I just know that we saw earlier that John had provided you his self-evaluation a couple weeks before this February 27 meeting, right?

A.        You showed me an email that said that, yes.

Q.        Okay.

A.        And I believe my response was I don't recall ever opening it or reading it because what you're showing me right now, that's not mine to look at until after John reads it to me.  And that's -- that's still what I do today.  I'm not sure what I'm not explaining clearly.

Q.        Well, here's another question, do you think John's self-evaluation that he had provided to you at your request would have been relevant to what you included in the performance improvement plan?

A.        I do not know.  I don't -- I have no idea what's in that document.

171

Q.      Okay.

A.      I don't know.  We never finished that process.  So, I mean, even today, in 2025, '24, the end of last year when we did our annual reviews, do your part of the review, we'll schedule a meeting.  Sometimes if I didn't say you need to send it to me by this date, they would not attend the meeting or they wouldn't produce the document or whatever else.  The thing was e-mailed to me as a courtesy, so when I go to put my half together I've already reviewed it with the employee, and I can cut and paste their strengths and weaknesses from them or use the document to make both of our lives easier.  It's not to pregame the meeting.  We do it the way the annual review process, that's how we do it.  O'Sullivan always sends me his early.  I don't want to read it until he -- I just don't read it.  It's not my thing.  It's kind of like spoiling the ending.  I don't want to spoil the ending.  I want to hear -- I want to hear what John has to say.  I want to hear what Brendan has to say.

Q.      Okay.  Well, let me share this.

172

A.      I can't answer your question.  I didn't -- I didn't read the document.

Q.      Okay.  So I shared my screen again. This is Exhibit 9 from Plaintiff's deposition. So I guess my question to you is if in -- let me try and ask it in a different way.

If in an employee self-evaluation meeting it's not a best practice for the employee to give their evaluation to the supervisor before they communicate with them orally, why did you do something differently here and give John the document and then read it to him in this meeting?

A.      'Cause it wasn't an employee evaluation.

Q.      Any other reason?

A.      There was nothing calculated in what we were going to talk about.  I looked at it as this is the same document we're about to review.  I'm going to read it to you.  I looked at it as a courtesy that this is how -- I think it's -- it's pretty common when I go to a meeting somebody gives me what we're about to talk about so we're on the same page.  I did not

173

intentionally give John a document or withhold a document.  It's just this is where it is.  This was -- it was business is business is business.  I had no idea that that day was going to go the way it did.  I totally -- I did not anticipate that.

Q.    Even though you understood that John was impacted by conflict?

A.    Yes.  We had had several sit-downs before.  John, I've got three complaints against you.  I don't know what's going on.  We got to figure it out.  Can we figure it out together?  He didn't like that conversation either, but we had it, and I shared it with him the same way.  It was -- I wasn't making accusations.  I wasn't being punitive or saying you shall or you need to do this right now or tell me exactly what happened.  I said, John, this is -- we got to work on this, and the PIP was more direct than the other ones because we seem to be escalating this and without resolution or without improvement.  My goal on each of these is to modify behavior and identify what can we do to

174

work together, what can we do better to work together.

Q.    Before the February 27 meeting John had been asking to meet with you one on one; is that right?

A.    Yes.

Q.    Is there a reason you decided to give him this performance improvement plan with Randy in the room and not just the two of you?

A.    Yes.

Q.    Why?

A.    Because we had done this kind of work the three of us.  It's just we're a team, there's three of us.  That's the way we'd been doing it.

Q.    Had you given other employees performance improvement plans either before this one or after?

A.    Probably not quite this formally. I don't -- I really -- I don't track those kind of things.  Not to this level.  And I've never had one escalate like this did.  This totally caught me by surprise.

175

Q.        Okay.  I want to look at -- your memo states that John said why am I being targeted.  Powers stated that he felt he was being bullied.  Do you see that?

A.        I do.

Q.        Okay.  Did you respond to that specifically?

A.        I don't recall responding to that because I looked at that as fuel to the fire in a similar way to the way he'd try to wind me up in front of James Rowan when we were having coaching sessions.  I know he wasn't being targeted.  I know he wasn't being bullied.  He knows that both of those would be keywords to me because I work in that field.  I wasn't going to respond or react to that.  I just wanted to go over the memo.

Q.        Okay.  So after John said that he felt like he was being bullied, you continued to read the memo; is that right?

A.        I have to read my notes again. That's roughly what I recall.  I mean, it says he had another conversation about people being in

176

his personnel jacket, so somewhere in that period of time he also questioned me about that which we did try to validate, but we were unable to substantiate because -- I agree with John a hundred percent. If one of his inspectors was in his jacket, I have a problem.

Q.    Okay, I want to focus your attention to the sentence at the bottom where it says, "Emanuel began to read the memo again and completed Point 5 when John stood up." So let me show you the memo.

A.    Yeah. And where is Point 5?

Q.    There we go. This is exhibit -- I'm showing you what's been marked as Exhibit 8 in plaintiff's deposition.

Mr. Emanuel, is this the performance improvement plan you provided John at the February 27 meeting?

A.    Yes.

Q.    Okay. So it looks like Paragraph 5 is on the second page here. Is that what you meant by Point 5?

A.    Yes.

177

Q.      Okay.

A.      Yup.

Q.      All right, so you were able to read from the top all the way to Paragraph 5 before John left the meeting; is that right?

A.      Yes.  I can't tell if it was all in one bite or, you know, when I tried to continue. I just wanted to plow through the material so John could hear it, and then he could take the memo home and ruminate or reflect or process.

Q.      Given John's reaction at the beginning of this meeting, do you think John was focusing on what you were reading?

A.      Probably not.

Q.      So I'm back to your memo, Exhibit 9 of plaintiff's deposition, and it says that you got to Point 5, John stood up, pushed in his chair and informed us that he was going home sick.  He further stated that he was having a physical reaction to this, and he can't deal with this right now because of all the stress that he was under.  He left his copy of the memo on the table, turned, stated good day and walked out the

178

door.  Do you see that?

A.      I do.

Q.      Okay.  So at this point when John left, what were you thinking about John's reaction?

A.      That it -- I thought John had acted inappropriately.

Q.      Mm-hmm.  Do you think that John was having some kind of elevated stress reaction to what had just happened at the meeting?

A.      Looking back at it from this standpoint, I do.  At that point in time, it was just a meeting.

Q.      Yeah.  Looking back at this point in time, is it fair to say that John was having a mental health episode at this meeting?

MR. MARTIN:  Objection.  You can answer.

A.      I'm not a clinician.  I can't diagnose that.  I know that John didn't deal well with conflict.  I was trying to minimize the conflict and just say I just want to have the conversation and we can go in different

179

directions and talk about it later.

Q.       But this wasn't a conversation, right?  I mean, you were reading the memo to him, right?  It wasn't a back and forth dialogue.

A.       I was not looking for a dialogue. I made it really clear that in my opinion, tried to make it clear that I did not want a response today.  I just had to give him my feelings and feedback.

Q.       All right.  The next paragraph here it says Emanuel and Trull discussed the best way to follow up with John, noting that he is already connected with counseling.  My question is why did you and Randy discuss the best way to follow up with John?

A.       Normally, if this wasn't a deputy chief, we might have said, hey, we need to make sure you have the EAP number or we need to make sure that you have access to support, whether it's your network at home, your network at work or through a care provider.

Q.       Right.  And the sentence goes on noting that he is already connected with

180

counseling.  Do you see that?

A.     Yes, I do.

Q.     Okay.  So you felt like John was having some sort of mental health episode, but he had -- he was already connected with counseling. So if he needed someone to speak with about it, he could reach out to his counselor?

A.     He had resources in play, absolutely, yes.  'Cause it's -- my experience is that when you have a resource that's existing, it's a much stronger relationship than you're going to get calling a hotline or calling an employee assistance program that doesn't know who you are.  You know, if -- if you have a professional that you're meeting with every week and you've met with this person for years, you have far more support already in play than the Town of Durham can provide.

Q.     I want to go up to -- sorry.  I want to go back to Plaintiff's Exhibit 8.  So this is the performance improvement plan. Number 1 says you will work standard business hours between 8 and 5 and will notify me in

181

advance if you need to modify your schedule.  Do you see that?

A.    I do.

Q.    Okay.  Do you think that could have been interpreted by John as saying that he had to get advance permission from you to see his counselor?

A.    I do not.

Q.    Why not?

A.    'Cause, I mean, I think that we understood that that was almost a term and condition of his employment.  He has a pre-existing condition.  We've never tracked his time for it.  He has to do it.  We have done nothing but support him on that front.

Q.    Same question with number 2.  It says you will notify me in advance when you will not be at work and complete the required leave request when you are not working.  Do you think John interpreted that as saying that he had to now complete leave requests to go to his counselor?

MR. MARTIN:  Objection.

182

A.    I do not.  Sorry.

Q.    That's okay.  Why not?

A.    Is there an objection to that part too.

MR. MARTIN:  Go ahead.

Q.    No, no.  You can answer.

A.    We had a working relationship.  I'm not trying to take somebody's birthday away, and we had talked about work schedules and flexibility and salary positions and just filing leave if you need to take leave and working wherever you need to work, but you have to communicate.  This was a communication issue.

We were receiving complaints internally and externally that our person wasn't where they were supposed to be, and I focus on the good, not the bad.  I was doing everything I could to say, John, we just need -- we need to make this a little bit more formal because we're both getting in trouble because we don't know when you're here, we don't know where you are, you aren't where you're supposed to be.  We just need to formalize this until we can get through

183

this patch.

Q.    I'm going to turn to Plaintiff's Exhibit 9, second page.  This paragraph that I'm highlighting it starts with "Emanuel and Trull discussed the option of appointing Deputy Powers the acting chief for the period of March 1 through 5, 2020, and questioned his state of mind and commitment to the organization based upon his early self-termination of the meeting before the letter had been completely read and the fact that he appears to have returned his staff car to the station."  So I want to start why did you and Randy question John's state of mind.

A.    We couldn't complete a professional conversation in a professional setting with three individuals that are all professionals.  In a non-confrontational setting.

Q.    But I think you had just testified earlier that you wanted -- that you thought that John was experiencing a mental health event and wanted to make sure he was connected with counseling, right?

A.    We made sure that John had a

184

support network in place, yes, and we agreed that John was acting in a behavioral -- in a manner that was unbecoming to an officer and wasn't consistent with being third in command of the fire department, yes.

Q.      But when you say you questioned his state of mind, I mean, did you think John was having some kind of mental health issue at that meeting?

A.      I am not a clinician.  I know that it wasn't conduct becoming for John or for a chief level fire officer.  I did not know what was going on, but I knew it wasn't right, and I knew it wasn't John.

Q.      The paragraph ends with -- it says, "the fact that he appears to have returned his staff car to the station."  Why did you include that part?

A.      Because it was weird.

Q.      Why did you think it was weird?

A.      Because that, the vehicle, is assigned to him, and if he said he was going home -- and if he went home, he went home.  I did

185

not understand why he would have returned his car, except the next paragraph talks about he use to spit and spat with the previous fire chief 'cause he knew it pissed him off.  It didn't -- the fact that he returned his car didn't upset me.  The thing that upset me was I thought he had quit.  Or I was, like, what just happened.  We went from a professional conversation to I'm going home.  Oh, wait, I'm going to come back and bring my car back and park it.  I wasn't sure what was going on.

Q.    Were you followed?  I mean at the last paragraph, right, it says you followed up. You texted him to check in and make sure that he was okay, right?  Why did you text to check in and make sure that he was okay?

A.    'Cause he was behaving erratically.

Q.    Right.  This was -- this was not how John would normally comport himself?

A.    Not with me.  I mean, what was the date?  This is the 27th.  The following -- this was -- whatever the day the 27th was, the following Monday John was supposed to be the

186

acting fire chief, and we were all set with that until this meeting.  There was something very wrong.

Q.    Okay.  So tell me -- so this was the afternoon of February 27th, correct?

Okay.  Afterwards --

THE COURT REPORTER:  I didn't hear the answer.  Was there an answer?

THE WITNESS:  Yes.  Yes, I believe.  I mean, that's what -- I'm not tight with dates.  If that's what the memo says, the 27th, then that's the date, yes, the 27th.

Q.    Fair.  Thanks for asking, Maryellen.

So after John leaves, tell me about the conversations you had about John's departure?

A.    I think Assistant Chief Trull and I were just -- we sat in the room for a few minutes saying just what happened and is he okay.  Does he have the support he needs.  What should we do for John.

When we finished that conversation, his car showed back up again which told me that

187

he didn't actually go home or he actually went home and then brought the car back or something happened. We did not understand or have enough information to be solid on the ground.

Q. Plaintiff's Exhibit 9 says you reached out to Captain Katz regarding the potential of appointing somebody else for when you and Randy would be traveling, right?

A. Yes.

Q. Okay. And then you said you explained that you had confirmed the potential need for assistance around noon on Friday, February 28th. Do you see that?

A. I do.

Q. What did you anticipate doing between that point and noon on February 28?

A. I figured I was going to talk to John and figure out which end was up and either get an apology or this is what happened and we're good.

Q. And, yeah, what -- what happened?

A. I don't think anything did.

Q. Well, John -- did John go to work

188

on Friday, the 28th?

A.    I don't believe he did.

Q.    After he didn't come in on Friday, the 28th, did you ever attempt to reach out to him?

A.    I don't believe that I did after the text that I said, you know, are you okay.  I didn't want to be inflammatory at this point.  The burden was on John.

Q.    The burden was on John to do what?

A.    Communicate.  I had attempted, and it didn't work well for me.  And he brought his car back, and I don't know what that means.  It would be easy to interpret a resignation out of that.

Q.    Well, John told you that -- in his text, he said I'm not okay, but I've made it home safely, right?

A.    Yes.

Q.    Okay.

A.    Greg, when I reached out to Captain Katz, I was looking at options as the fire chief, trying to weigh out the needs of the town, the

189

university and traveling because there were times where sometimes you put number 4 in charge of the fire department and they resume business as normal, this is not a big deal, everything is fine.  It became apparent that everything wasn't fine and that we, Randy and I, were not traveling together.  So we did not.  So I did not need help covering the chief's position.

Q.     Yeah, who -- who covered the chief's position that week?

A.     We split it.  I stayed home for the first half, and I flew down to speak for the day that I had to speak, and then I came back.  So Randy was here when I was not, and I was here when Randy was not.  We took care of it ourselves.

Q.     Before you gave John the performance improvement plan, did you, without telling me what you may have spoken about, did you speak with the town's lawyer about the performance improvement plan?

MR. MARTIN:  Objection.  It asks the witness to state the subject matter of his

190

conversation, counsel.

Q.      Let me try again, Mr. Emanuel.  I don't want to know anything about what you spoke with -- I don't want to know the substance of any communications with the town's lawyer.

My question is did you speak with the town's lawyer about the PIP before you gave it to John?

MR. MARTIN:  Objection.  I'm instructing him not to answer that.

MR. SILVERMAN:  Okay.

Mr. Emanuel, I've shared a document on my screen.  This is a privilege log that's been provided by your counsel.  I'm looking at this highlight right there.  It looks like you sent an email to the town lawyer on February 24, 2020, about John's performance improvement plan; is that correct?

A.      That looks like what that log shows.  I'm not familiar with this document.  Sorry.

Q.      Do you recall sending an email to Joseph McKittrick about John's performance

191

improvement plan?

A.      I know that I was working with my boss on keeping him apprised of what we were working with with John.  There are times when the town's attorney is involved in those meetings, and there are times when they're not.  If this says I sent an email on the 24th, I sent an email on the 24th.

Q.      Fair.  Without, I guess, getting into this particular performance improvement plan, just generally speaking, hypothetically why would one reach out to the town's lawyer before providing a performance improvement plan to an employee?

MR. MARTIN:  Objection.  You can answer.

A.      I guess I move by the mantra I don't like surprises, and I don't want my boss to ever be surprised.  So if we have a significant or even sometimes insignificant personnel issues here at the fire department, my boss wants to know about it, and he wants to hear it from me, not an aggrieved employee.  So I would tell you

192

that any kind of disciplinary or any kind of improvement or any kind of extreme conflict or situations that are out of the normal, I have a conversation with my supervisor about those.  If he tells me I need to talk to a town attorney, I talk to a town attorney.  If he tells me I need to talk to the business manager, I talk to the business manager.

Q.      So just to clarify, you had a -- before giving John the performance improvement plan, you had a conversation with Todd Selig about it, right?

A.      Yes, 'cause I wouldn't have gone to the town attorney without going to Todd Selig first.

Q.      Okay.  Do you recall your conversations with Mr. Selig about John's performance improvement plan?

A.      Not directly.

Q.      Okay.  Do you recall why Mr. Selig may have told you to go talk to the town's lawyer?

A.      I know that the two of them had

193

different history with John's first employment than I did. I was not on the inner circle then, and they both were, so. I never asked for it. I respect John for who he is, and he stands on his own merits. I did not -- I didn't have all the pieces of different puzzles, and I didn't have the same experiences that they had.

Q. Do you know what experiences they had concerning John that you didn't?

A. I do not.

Q. All right. Mr. Emanuel, I have shared my screen. This is Plaintiff's Exhibit 10. This looks like a letter you wrote to John suspending him with pay pending a fitness for duty evaluation. Do you see that?

A. I do.

Q. Okay. Why did you suspend John pending a fitness for duty evaluation on February 28th?

A. Because John's conduct of an officer was unbecoming, and when he returned his vehicle to the fire department, it was clear to me that we had a problem.

194

Q.      Specifically, though, why did you send him for a fitness for duty evaluation?

A.      Because, as a fire chief, I'm not qualified to say someone is fit or not fit for duty.

Q.      Okay.  But John's reaction made you think that psychologically he might not be fit for duty, right?

A.      John's reaction made me think that there was something wrong, and I wanted a professional opinion, yes.

Q.      Right.  Something wrong mentally, right?

A.      I couldn't tell if it was physical or mental, some combination.  I'm not qualified to make that judgment.  John told me there was something wrong and he wasn't okay.

Q.      Okay.  I've shared my screen.  This is Exhibit 1.  Topic 13, the town's policies, procedures and practices concerning fitness for duty examinations.  Do you see that?

A.      I do.

Q.      Okay.  Does the town have any

195

written policy or procedure about fitness for duty evaluations?

A.    We do for health screening but not in this realm of psychological evaluations, not that I'm aware of.

Q.    When you say health screening, is that physical and mental health?

A.    You know, they say it is.  We follow the NFPA 15 -- the National Fire Protection Association, 1582, physical requirements for firefighters which look at everything from -- there are questions regarding mental health, yes, but it's more focused on our physical capabilities and can we perform the job. Are our lungs good, is our heart good, is our stress good.  It's usually -- it's more subjective.  It usually focuses more on the physical capabilities or any ailments that I've picked up along the way through my career that would inhibit me from performing my job function.

Q.    Just to -- it's a back up.  I think we talked about this earlier, but when firefighters are first hired at the town, they

196

undergo a physical and mental health evaluation, right?

A.    Yes.

Q.    Okay.  Are there any -- does the town have any policies, any written procedures about providing an employee who's not a new hire with a fitness for duty evaluation?

A.    Say it one more time, Greg, please.  Sorry.

Q.    Sure.  Does the town have any written policies or procedures about providing a fitness for duty exam to a current employee and not just a new hire?

A.    We do annual physicals every year.  We all do annual physicals every year.  So that side, yes.

Q.    But you don't do annual mental health screenings; do you?

A.    Not -- no, not a fit for duty mental -- behavioral health screening, that's correct.

Q.    Right.  So are there any -- does the town have any written policies or procedures

197

about providing fitness for duty examinations to current employees when looking at their psychological health?

A.    Not that I'm aware of.

Q.    Okay.  Thank you.  Does the town have any known practices about giving fitness for duty examinations to current employees?

A.    I know that it's expected.  If the -- if the department head feels they need this service, they will get it.

Q.    Okay.  And why -- or let me ask you this, have you ordered a fitness for duty examination for any current employee besides John?

A.    On the behavioral health side, no, that's the only one for me.

Q.    Okay.  And why did you order that John undergo a fitness for duty examination?

A.    John's conduct and actions made me question his ability to serve in the capacity of deputy chief for the fire department.

When you had asked about the command structure earlier or how the

198

organizational structure of the fire department works, it's a paramilitary organization.  The responsibilities of the prevention deputy and safety -- John could command a fire tomorrow.  If John's the acting fire chief, John's doing everything from answering questions to signing payroll.  There's a lot of responsibility that goes with these positions.  And when you're an incident commander, the lives and safety of everyone on that incident falls on your shoulders.  So it's a very stressful occupation and different from being a firefighter or a captain.  There's one guy who's responsible (indicating).  And if I'm not present and the assistant chief is the acting chief, he's responsible.  And if he's not present and the deputy is, he's responsible.  Or on an emergency incident or a response, the incident commander could be anyone from the lowest firefighter to the highest chief.  And we train so anybody can fill that position on the spectrum.  But the higher you -- the higher your rank is and the more experience you have, the more proficient you

199

are, the more you understand every decision you make has a consequence and an impact on everyone's lives, both the people that we're protecting and the people on the fire ground. You need to be tight. There's no margin of error.

Q. So you thought that at the time John's mental health threatened his capacity to perform his essential duties?

A. At that juncture, yeah, we were backed into the corner. We went from having a conversation to I'm leaving, here's my car, I'm not okay. That's three. I don't think I had any other choices.

Q. What did you or let me go back to or strike that.

What did you expect to learn from a fitness for duty evaluation for John?

A. I'm not sure. I was hoping that I'd get a letter back saying John had an episode, he's tight, he's good, all clear. Or an explanation. Hey, chief, I had a bad day. I'm good.

200

(Whereupon, Deposition Exhibit 11,

Meeting Notes:  Follow up log, RE:

Expectations and Performance Improvement

Plan for Powers, March 2, 2020,

was marked for identification.)

**BY MR. SILVERMAN:**

Q.      Okay.  Mr. Emanuel, I've shared my screen.  This is a document marked as Exhibit 11, Bates stamped DEF 119 through 120.  Have you seen this document before?

A.      Yes.

Q.      Okay.  Did you write this document?

A.      Yes.  And I didn't finish the first sentence.  I apologize, Greg.  Poor penmanship on my part.

Q.      No problem.  Okay.  Where it says, "Ronald Longpree:  Fit for duty evaluation, evaluates psychological ability."  Do you see that?

A.      Yes.

Q.      Okay.  So the purpose of the fitness for duty evaluation was to evaluate John's psychological ability to continue in his

201

job, right?

A.     To validate that he was fit to perform his duties as a deputy chief, yes.

Q.     Okay.  And then it says, "May still be a terrible employee."  Why did you write that?

A.     I would say that those are probably not my words but that was part of one of the conversations that was had.

Q.     Got it.  Was this a conversation you had with Ronald Longpree?

A.     I don't recall who that conversation was with.

Q.     Okay.

A.     The line right above it, about freeze account --

Q.     Yup.

A.     -- and out of office --

Q.     Yup.

A.     -- that was a conversation that I had with the town administrator, and we were trying to do damage control for the fire department and town, and we didn't want to freeze John's account because I know that John had

202

comingled his family appointments and his medical appointments and his emails with his town calendar and email.  So we were doing everything we could to support John through this.  We're not trying to take away the tools.  We're not trying to shut things off or freeze him.  We're trying to do everything we can so our team member can succeed.

Q.     I'm looking at -- under Tuesday, March 3, 2020.

A.     Yes.

Q.     This is Joe McKittrick.  "Is there any way to move the appointment earlier?  Not for Longpree or Durand).  Suspension stands until further notice, do not reconsider decision."  What does that mean suspension stands until further notice, do not reconsider decision?

A.     We were hurting on workload that we just were not able to -- we were not staying current with inspections or process-driven projects in Durham, and I was asking can I -- is it -- does my management team above me support me bringing back John or can John work from home

203

until we can get him an appointment 'cause we can't get him an appointment right away.

Q.   So they said keep him suspended, don't let him work from home or otherwise?

A.   Not working.  He's out of work with pay until you get something back, yes.  I was trying to accommodate John, anything I can do.

Q.   Below -- well, the top of the second page it says, "Powers notifying firefighters that he has been expended is out of order for a chief executive and does not demonstrate leadership at the chief office level."  Do you see that?

A.   I do.

Q.   Okay.  You never told John that he couldn't tell other people he was suspended, right?

A.   That's correct.

Q.   Okay.

A.   I don't think I told anybody other than my boss and the key leadership staff here that that was the action.  We just shared that John was going to be out of work for a period.

204

They didn't know whether he had a sick dog or he was on vacation.  I did not share that information.

Q.      Why did you think it was inappropriate for John to tell others that he was suspended?

A.      Well, I think the biggest reason was we had -- there were a number of people here who had acquired a learned behavior that we associated with I'm going to try to win the hearts and minds of the firefighters, and we're going to vote that you're wrong so you change your decision, or I'm going to burn the ship down because I don't like your decision, or I'm going to air all my dirty laundry at the kitchen table to try to upset the organization and cause chaos to show you who the boss is.

I mean, we were all -- any time you go to officer school, you bitch up, not down. You can't bitch down.  We usually show the Private Ryan movie, the scene with Tom Hanks walking through the field where everybody's complaining about the stupid mission.  And they

205

say, Cap, what's your take on it?  And he says, I am in command of a bunch of valuable assets, and the United States Army needs us to go and perform a critical function.  If I have a problem with that, I talk to my supervisor, not you.  Are there any questions?

It would be completely out of line for a chief-level officer to go tell everybody that he was being suspended or disciplined or questioned.  It's not their business.

Q.   Do you know under what circumstances John was notifying people that he had been suspended?

A.   I do not.

MR. SILVERMAN:  Maryellen, can we go off the record.

THE COURT REPORTER:  Yes.  We are going off the record at 2:10 p.m.

(A break was taken from 2:10 to.

2:20 p.m.)

(Whereupon, Deposition Exhibit 12,

Text messages with Todd Selig,

was marked for identification.)

206

*BY MR. SILVERMAN:*

Q.        Mr. Emanuel, I'm sharing with you what I've marked as Exhibit 12.  This is Bates stamped DEF 2681.  These are documents I received from your counsel.  Are these your text messages with Supervisor Selig?

A.        It would appear so, yes.  I usually sign them, but yeah.  Yeah, that makes sense.

Q.        Okay.  These text messages start July 5, 2018, and it looks like the last one is March 10, 2020.  Do you see that?

A.        I do.

Q.        Are these the only text messages you've ever had with Mr. Selig?

A.        I can't answer that.  That's totally possible.  I don't know.

Q.        Well, do you only text him about John Powers?

A.        I don't text him frequently.  I text him from time to time, and I can't answer that.  I would say that I have -- I have texted my town administrator on things other than John Powers.

207

Q.      Do you know why those texts have not been disclosed?

A.      I'm not familiar with this document, Attorney Silverman.

Q.      Okay.  Mr. Emanuel, I'm looking at this text on February 28.

A.      Mm-hmm.

Q.      It starts with "Good morning, Todd."  There's some redactions.  I'll talk with your counsel about those.

You say that you are concerned that he elected to return his staff car to the fire station yesterday and that he is unable to perform his duties at this time.  I'm afraid that things are not going well and are going to continue to get worse.  Do you see that?

A.      I do see that, yes.

Q.      Okay.  Why were you afraid things were going to continue to get worse?

A.      Because John is a consummate doom and gloom person per his words, and sometimes when he ruminates things too much, it's not healthy for him.  I think that he was leading

208

himself down a road that was not compatible with service as a deputy chief of a fire department.

Q.    And you believe that based on his doom and gloom outlook and ability to ruminate?

A.    No, I believe that based on his behaviors and performance and we couldn't have a conversation, and then he turned around and dropped his car off and then said I'm not okay.

Q.    And so that's why you thought things would get worse?

A.    I figured we were looking at a resignation or it's not going to go well because he brought his car back.  I don't know how to read that other than --

Q.    Well, he didn't formally say he was quitting or resigning, right?

A.    I don't believe I had any communications with him other than I'm not okay.

Q.    Right.  Did you think things were going to continue to get worse because John was going to be unable to respond to your performance improvement plan?

A.    I wasn't sure what John was going

209

to be able to respond to.  I really wasn't sure what was going on other than I couldn't just sweep this under the rug and say we're all good. Something changed between today and yesterday.

And I just remember we had a tremendous workload at this point in time.  So going from a three-person team of a deputy and two inspectors to a two-person team with just two inspectors and one of them wants to leave 'cause he doesn't like John, that's getting worse. That's not better.

Q.    After this text message with Mr. Selig, did you have any other conversations with him about John's suspension and fitness for duty eval?

A.    I don't recall.  I would have been consulting, and this is -- the Town of Durham we do the best we can to support each other, and my boss is exceptional and does everything he can to provide every opportunity to each of us to succeed, and he's very deliberate on both communications and actions to say here is another chance or what can we do to help you, and we talk

210

about that stuff frequently for all of us all of the time.  Whether it's the police department, the fire department, public works employee, what's the best thing we can do for this person.

Q.    Right.  And at this time, February 28, 2020, what did you think was the best thing you could do for John?

A.    I wasn't -- mine personally?  I thought it was to stay out of John's hair until he was ready to talk.  To not try to intimidate him and not try to back him into a corner.  To just keep putting olive branches out to say what can I do to help you.  To give him space 'cause he needed time to process.

BY MR. SILVERMAN:

Q.    All right.  I'm going to show you what's been marked as Plaintiff Exhibit 12.  This is a March 6, 2020, email from John to you ccing Randy and Mr. Selig.

MR. MARTIN:  What's the Bates number on that, Greg?

MR. SILVERMAN:  DEF 122 and 123.

MR. MARTIN:  Thank you.

211

MR. SILVERMAN:  You bet.

Mr. Emanuel, did you receive this email.

A.      I did.

Q.      Okay.  And what were your thoughts when you received it?

A.      I was trying to figure out what we were talking about because this was back to we weren't addressing the issues at hand, and I was trying to understand what -- I was trying to understand what we were talking about.

Q.      When you say you were trying to understand what we were talking about, what do you mean?

A.      Can you go back up to the top of the memo, please.

Q.      Of course.

A.      Well, John's asking for a grievance or filing a grievance saying he's been aggrieved and talking about a DISC assessment and a consultant and communication challenges, some different conversations that the assistant chief deputy and I had had, and then his performance

212

employee -- his employee performance improvement plan. I was trying to understand what all these things had to do with one another or how we were going to improve our communications or there was -- John was filing a grievance, so, that I did something wrong.

Q.   So you felt like you did something wrong?

A.   I did not. I felt John thought I did something wrong.

Q.   Understood.

A.   We're not talking -- sometimes John would get distracted, and again, we'd go back to talking about a person or an action or a thing or a distractor, not the issue at hand. The issue at hand was we had conduct unbecoming, we had actions unbecoming. He returned his car and told me he wasn't okay. Nothing in this letter addressed any of those. We're not talking about the right content. We're not having the right conversation. He's telling me that I messed up the process.

Q.   What about the request -- do you

213

see the paragraph that says requested relief?

A.    I do, yes.

Q.    Okay.  So he, John, was looking to revoke the order that he sit for a psychological exam.  He said he wanted an opportunity to respond in writing to the issues raised in the PIP and continue discussions with you about how you could generally improve your working relationship.  Do you see that?

A.    I do.

Q.    So was that requested relief, was that relevant to the issues at hand?

A.    Virtually, if that.  It doesn't say what he's going to do or what he -- you know, there's no ownership in this.  This is all still, Chief, this is your problem, and you didn't do it right, and I'm not going to do anything else until you make it right.  This is a quid pro quo. I'm not going to sit for the exam until you give me this stay.

Q.    Well, if I look at the last paragraph, it says, "The town's procedures contemplate that this grievance may not be

214

finalized by the date the department scheduled for my psychological exam," and then he said he didn't plan to attend unless the grievance process was resolved before then, right?

A.    Yes.

Q.    So he -- I think the -- he stated he or at least contemplated being open to sitting for the fitness for duty eval if the grievance procedures were resolved, right?

A.    Yes.

Q.    So -- okay.  So after you received this, who did you talk about it with?

A.    I talked to my boss, the town administrator.

Q.    Okay.  Yeah, what did you and Mr. Selig talk about?

A.    What are the merits.  What is the -- normally a grievance -- the grievance has to be, you know -- sorry, guys, I'm not a good enough lawyer to tell you exactly what a grievance -- what the terms and conditions of a grievance are, but you have to have a contract that's violated to be aggrieved.  And because I

215

don't -- I felt that I hadn't violated the town personnel plan and John isn't covered by a collective bargaining agreement, there's no grievance.

Q.    When a union grieves something under the CBA, they're alleging that a provision of the CBA has been violated, right?

A.    Correct.

Q.    Okay.  If the town decides to go through the grievance procedures, the town isn't necessarily admitting that they did something wrong by going through the grievance procedures, right?

A.    That's correct.  I agree with that. I'm not sure I have the -- yeah, I agree with that.

Q.    So here this -- John was -- I mean his requested relief was to say that he didn't want to sit for the psych eval.  He wanted to respond in writing to the PIP and have a meeting with you, right?

A.    Yes.

Q.    So did you ever consider meeting

216

with him per this email?

A.    If John had said can I come in and talk to you or when can we talk, I would have said let's go.  John didn't say that.  John said I will only follow your orders if you do this.  That's not how military or paramilitary organizations function.

Q.    Well, it looked like John was looking to have a conversation with you before the date of the psych eval, right?

MR. MARTIN:  Objection.  You can answer.

A.    I don't know.  I looked at this as a negotiation, not a can we sit and talk.  This is a negotiation.  There's strings attached, Greg.

Q.    Well, it looked like -- I mean, would you agree with me that John was saying that I would like to go through these grievance -- I would like to go through the grievance process before I sit for a psych eval?

A.    I agree that he did ask for that, yes.

217

Q.      Okay.  When you talked to Mr. Selig, what did he say about this?

A.      We agreed that the fire chief would normally be the first step in the grievance process.  And that John had filed the grievance with me, so it was my job to either say I agree with your -- I agree with your position or I disagree with your position or there's nothing aggrieved, you have not been aggrieved with the town's personnel plan, and Option C was the option that I took.  We did not violate the personnel plan.  If we had said, John, I'm not going to pay you; John, you can't use sick time, or John, we're going to take something away that you have as a right and privilege as a town employee, I think there could be a grievance.  I didn't believe any of those had taken place. There is no grievance.

(Whereupon, Deposition Exhibit 13, 3/10/20 letter to Jill Durand, Psy.D. from David Emanuel with Attachments, was marked for identification.)

*BY MR. SILVERMAN:*

218

Q.      Okay.  Mr. Emanuel, I'm sharing a document that's been marked as Exhibit 13.  This is, first page, Bates stamped DEF 196.  It's a long one.  The last page is Bates stamped DEF 290.  Do you recognize this document?

A.      I do.

Q.      Did you ever talk with Dr. Durand orally before this psych eval?

A.      I do not recall.  I'm sure we at least figured -- either I reached out to her or our admin reached out to her to verify that she could conduct the evaluation.  So one of us at least spoke with Dr. Durand's office to verify that A -- she normally did pre-employment screening for us, so, A, she could offer the service and, B, could do it in a timely manner.  So I'm confident that the Town of Durham reached out to Dr. Durand to make sure she was a viable asset that could help us with our challenge to perform a service.

Q.      And do you know -- numbers 1 through 3 include documents, and I'll represent that they're attached after this letter.  Do you

219

know if Dr. Durand requested those, or did you voluntarily give those to her?

A.     She would have said I need you to send me A, B and C or 1, 2 and 3.  She'd have a list of things she was looking for.  It's just part of her business plan.  This is -- this is not a personal thing for her.  This is -- this is business.

Q.     Sure.

A.     If you want me to do a fitness for duty exam, this is what you will send me, and we provide that information.

Q.     Do you know how much Dr. Durand charged the town for this evaluation?

A.     I do not.  They're usually around a thousand bucks.  I don't know.

Q.     Okay.

A.     I don't know.

Q.     I'll represent, Mr. Emanuel, that this exhibit and what it appears to be, your letter to Dr. Durand, does not include John's self-evaluation he completed in early 2020.  Do you know why that might not have been included?

220

A.      Yes.

Q.      Why?

A.      'Cause I never performed his evaluation in 2020.

Q.      Do you think his self-evaluation might be relevant to her evaluation of John?

A.      I can't answer that.  I never opened the document.  John never read it to me.  I never looked at it.  I don't know.  I don't even recall.  You asked me if I recalled receiving the email, I did not.  So if I had -- if I had never read it, if I had never reviewed it, if I had never gone over it with John, I would have no knowledge of whether or not that would be relevant to this or not.

It wasn't intentional.  It was not an intentional misrepresentation, if that's what you're asking me.  I never read it.  We never met.  It would be out of order.

(Whereupon, Deposition Exhibit 14,
    Emails (DEF 499 - 501),
    was marked for identification.)

*BY MR. SILVERMAN:*

221

Q.      Mr. Emanuel, I have shared my screen.  This is what I've marked as Exhibit 14. This is DEF 499 through DEF 501.  It looks like Dr. Durand is forwarding emails from John to you.

A.      Me, yes.

Q.      Do you recall receiving this email?

A.      I do.

Q.      Okay.  Did you -- do you recall reviewing what I highlighted as John writing to Dr. Durand Sunday, March 15, 2020?

A.      I do.

Q.      And what did you think about that?

A.      I really didn't think about that because when I read the line below it or John had said I revoke all -- I revoke all of my permissions, that was the a -- that's what I focused on.

Q.      Okay.  Why did you focus on that?

A.      Because it was non-compliance with what we had asked for or it was a -- it was a bait and switch or it's just that John had a -- John had a streak where he did this kind of thing, that I'm going to do most of what you ask

222

for, but I'm not going to give it to you.  Or I'm going to tell you most of the story but not all of it.  Or -- it was consistent with John's behaviors.

Q.    Well, he says -- in the line I highlighted, he said, "I don't yet consent to share anything related to it until the grievance process concludes."  Do you see that?

A.    I do.

Q.    Okay.  So John is leaving open here that he could share the content of the results, but he wanted to go through the grievance process.  Is that your understanding of what he said?

A.    I do believe that's what it says, yes.

Q.    Okay.  So and ultimately the town never went through the grievance process with John, right?

A.    I would tell you that we did because he got a ruling from the fire chief and he got a ruling from the town administrator.

Q.    Well, right.  The ruling was there

223

was no grievance, right?

A.     That is correct.

Q.     Okay.

A.     I'm pretty certain that I committed that to pen and paper, and I'm confident that my -- our town administrator also informed John of his position.  So I disagree with you saying we did not go through the process, and I disagree with you that it was unresolved.  It was resolved.

Q.     Okay.  Mr. Emanuel, I shared my screen.  This is Plaintiff's Exhibit 14, Bates stamped DEF 294.  So -- wrong date.

All right, so this says you determined that no action has transpired to date that is grievable, and as such, there's no grievance, right?

A.     Yes.

Q.     Okay.  And then it says if you wish to schedule a time to sit down and hear the PIP and continue where we left off, including hearing your concerns, we can do so.  Do you see that?

A.     I do.

224

Q.      Okay.  Isn't that what John's grievance requested?

A.      In the form of a grievance, yes. This goes back to conflict resolution again. What is the end result that both parties are looking for.  I want to resolve it.  John, can we sit down, can we talk about this.  I asked him that as the fire chief, what do we need to do to sit down.

Q.      Well, right, and it looked like John was trying to go through the grievance process to sit down with you and talk about this.

MR. MARTIN:  Objection.  You can answer.

A.      I agree.  I didn't -- it wasn't part of the grievance process.  I just wanted to sit down, no strings attached.  I want to sit down.  I want to learn about what's going on.  I want to verify that you're okay, and we want to check to make sure that you're fit for duty.  I agree with you, Greg, we were -- we were trying to do the same thing, and I was trying to communicate clearly and directly as the fire

225

chief.  I just -- I wasn't getting through.

Q.      Right, this looked like an obvious communication issue 'cause it looked like John was trying to sit down and talk about the PIP and your working relationship and you were willing to do that as well.

A.      I was.

Q.      But you said you weren't willing to do that through the grievance process, and my question is why not?

MR. MARTIN:  Objection.  You can answer.

A.      I just want to sit down.  There's no strings attached.  I'm offering to talk.  You're offering to talk only if A, B and C occur.  This is no deal.  This is not a negotiation.

Q.      Well, you could have denied the grievance, right?  You could have met with John, talked with him and say, John, I deny your grievance, right?

A.      I could have.  Yup, that's one of the three options.  I wasn't the one who brought up the grievance.  I just wanted to talk.  I just

226

want to talk.

Q.    Mr. Emanuel, I've shared my screen. This is Plaintiff's Exhibit 13.  All right, so this is page Bates stamped at the bottom DEF 592. This is Paragraph G, grievance procedure for employees.  Do you see it?

A.    Yes.

Q.    Okay.  So this says if desired, or let me just first start here.  This was the non-union personnel plan that applied to John, right?

A.    Yes.

Q.    Okay.  And have you reviewed this personnel plan as it relates to grievances?

A.    From time to time, yes.

Q.    Okay.  Besides John, has any non-union employee attempted to use these grievance procedures with you?

A.    With me, not that I'm aware of.

Q.    So this says, first sentence, "If desired" -- oops.  "If desired, a written grievance must be -- must first be made to the employee's department head within five workdays

227

of the action giving rise to the grievance." Do you see that?

A.    I do.

Q.    Okay. So this sentence says that a town action could give rise to a grievance, right?

A.    Sure.

Q.    Yeah. And would you agree with me that a suspension is a town action?

A.    I would agree that a town -- that a suspension is a town action, yup.

Q.    Would you agree that an order to sit for a psych eval is a town action?

A.    I would.

Q.    Next sentence. Would you also agree that a -- giving an employee a performance improvement plan is a town action?

A.    I would.

Q.    Next sentence says, "The appeal must include the issue giving rise to the grievance, the facts as the employee views them, and the requested relief." Do you see that?

A.    I do.

228

Q.      Okay.  So this second sentence says there could be a workplace issue giving rise to a grievance, right?

A.      It does.

Q.      So a performance improvement plan could be a workplace issue, right?

A.      Yes.

Q.      And a suspension pending a fitness for duty evaluation could be a workplace issue, right?

MR. MARTIN:  Objection.

A.      Yes.

Q.      Okay.  Okay, then it says the department head will respond to this appeal within five workdays, right?

A.      It does.

Q.      Okay.  And then it says if the employee is not satisfied with the action to be taken by the department head, the employee may appeal the matter to the town administrator.  Do you see that?

A.      I do.

Q.      Okay.  When John grieved -- when

229

John sent his March 6th grievance to you, did you review this Paragraph G before responding?

A.    I'm confident that I did.

Q.    All right.  I've shared with you what's been marked as Plaintiff's Exhibit 19, Bates stamped at the bottom DEF 347 to 348.

It looks like -- I'll start at John's email March 19, second paragraph.  It looks like that John says that he's responding to your denial of the grievance, and he says that he understands the next step was for Mr. Selig and you and the chief to sit and try and resolve our issues, and he's wondering when that might occur.  Did you see this email?

A.    I did.

Q.    Okay.  Did you have a conversation with Mr. Selig about it?

A.    I did.

Q.    Okay.  What did you discuss?

A.    I don't recall that.  It was have you been able to sit and talk to John yet, and I had not sat and talked with John yet.

Q.    Was there anything preventing you

230

from, I don't know, texting or calling John and just say, hey, can we just meet without the grievance procedure?

A.      Other than my past experiences which said John needs time to process and John needs space.  The last -- the previous fire chief would try to get in John's space, and I know it bothered him.  I wasn't interested in bothering him.  I was interested in supporting him.  I tried to do everything I could given the tools and say I am here, when do you want to talk.

Q.      Right.  Well the grievance procedure was a tool, right?

A.      The grievance procedure is a tool, but it's not the tool that I opted to use and --

Q.      Right, you wanted to meet without the grievance procedure.  So my question is why not just text or call John and say can we just meet without the grievance procedure?

A.      I had already said that, can we just talk, in my communications, and I got back I'll talk under these conditions.  I'm not interested in talking about conditions.  The move

231

was John's to be made.  I had made a move.  I said, please, can we sit down and talk.  I believe I had done my due diligence in just trying to say, John, what do we need to do, and I didn't --

Q.    Can I ask --

(Cross-talk.)

A.       -- back out to say let's shake hands and talk about this.  I got a grievance saying I disagree with how you did it, and I'll only do this if you do that, and that's not -- again, back to conduct unbecoming.  I'm not interested in playing games.  And I need to be frank, during this email, John acknowledges that things are kind of busy right now, and Todd acknowledges that we're in a state of emergency, and we're going to talk about grievances.  This was around the point in time where COVID was taking off.  We were reading in the newspaper that there are U.S. naval vessels that are being overrun with sickness, that there are cruise ships that are being overrun by sickness.  There's mortality associated with it.  And we

232

work on a college campus with -- and we have three, four, ten story buildings that are remarkably like cruise ships where everybody shares everything, everybody lives together. Things are falling apart in the house world right now, and we were -- we didn't know how bad it was going to get, and we were going to an all hands on deck position right now, and I needed John Powers at work.  I did not need to be fighting about grievance procedures.  I needed to have a conversation.  I needed him in a fit for duty examination a couple of weeks or like within a few days of when we asked for it so we could have got John's cleared, we're good.  John, I need you back on the flight deck.  I didn't get any of those things.  And all I got was I'll only talk to you if you'll do this or I will only do this if you'll do that.  This was a really trying time for Durham Fire Department, the Town of Durham, the University of New Hampshire, the state and our country.  I don't know how to say it.  We're understaffed, we're overwhelmed, and we didn't know what was going on, and my number three guy

233

wants to talk about a grievance procedure.  Out of line.  I don't know how to say it nicely, Greg.  I'm sorry.

Q.      The grievance procedure -- now back on Plaintiff's Exhibit 13, right?  It says with an appeal.  The town administrator will meet with the employee and all parties involved, hear testimony, render a decision within seven days.  The employee will be given a written confirmation of the town administrator's decision, and the decision would be binding on all parties involved.  Do you see that?

A.      I do.

Q.      Okay.  Based on John's -- well, let's go back to his --

A.      Excuse me one sec.  Sorry about that.

Q.      That's okay.  Do you want to take a break?

A.      No, I'm okay.  Thank you.

Q.      Okay.  I'm almost done.

A.      No, it's all good.  That's a retirement announcement.  We just -- our police

234

chief just retired after 40 years of service and 14 as a police chief.  That was his retirement announcement.

Q.    Over the loud speaker?

A.    Yes.

(Whereupon, Deposition Exhibit 15,

3/19/2020 termination letter,

was marked for identification.)

**BY MR. SILVERMAN:**

Q.    Okay.  Mr. Emanuel, I want to show you what's been marked as Exhibit *14.  This is Bates stamped at the bottom RESP 3, PF 29.  It looks like your termination letter to John; is that right?

A.    Yes.

Q.    Okay.  Why did you terminate John?

A.    Non-compliance of a directive.

Q.    Okay.  And by that you mean he did not agree to disclose the contents of the fitness for duty eval with you?

A.    I asked for a fitness for duty evaluation, and he didn't complete the process. Agreed, yes.

235

Q.      Okay.  Okay, let's go back to Plaintiff's Exhibit 13.  This is the personnel policy, right.  So this says to appeal a grievance, you know, the town administrator holds this hearing and renders a decision on the grievance, right.  And just to go back, John's request on the grievance was that his suspension in order to sit for a psych eval be revoked and removed from his record.  That was one of his requests, right?

A.      Yes.

Q.      So the town administrator -- well, let me strike this.

The grievance procedure -- if the town had followed the grievance procedure, the town ultimately could have denied that request, right?  That the suspension and demand that John sit for a psych eval be revoked, right?

MR. MARTIN:  Objection.  You can answer.

A.      If that were to happen, we --

Q.      Well, John's grievance makes --
where is it.  Plaintiff's Exhibit 12.  John's

236

first request is that the suspension in order to sit for a psych exam be revoked and removed from his record.  Right, that's his request?

A.      That's his request.

Q.      Okay.  So if the town had followed the grievance procedures, they could have said that request for relief is denied, right?

A.      I think that could have been an option, mm-hmm.

Q.      Okay.  I want to go -- this is Plaintiff's Exhibit 19.  But to follow up, if the town had filed a grievance procedure and denied John's request that he not be made to sit for a psych eval, at that point John could have had the option to sit for the psych eval and disclose its contents to the town, right?

A.      That could have been an option.

Q.      Okay.  This is Plaintiff's Exhibit 9.  Mr. Selig says -- he says had there actually been a valid grievance on the matter, I would have denied it.  Do you see that?

A.      I do.

Q.      Do you know why Mr. Selig said

237

that?

A.      He said, "It's certainly a busy time for our nation, our state and our local community dealing with the ongoing COVID-19 pandemic national crisis.  As such, I will be succinct in my response to you, there was no grievance.  Had there actually been a grievance on the matter, I would have denied it."

Q.      My question is why does he say had there actually been a valid grievance on the matter I would have denied it?

A.      I can't answer that.  I didn't -- these are not my words.

Q.      These are the -- I mean, he's speaking on behalf of the town, right?

A.      (Witness nods.)

Q.      Okay.  And you're here testifying on behalf of the town, right?

A.      I am.

Q.      Okay.  But you don't know why he would have denied John's grievance had he considered it valid?

A.      That's correct.

238

Q.    After John's termination, did you have conversations with anyone about John before he filed the lawsuit?

A.    I'm not sure.  What do you mean anyone?

Q.    Fair.  Let me be more specific. After John was terminated, had you heard through the grapevine what he was up to?

A.    I don't understand what you're asking me.

Q.    My question is after John was terminated from the town did anyone tell you or did you hear from anyone what John was doing for work?

A.    I did, but I didn't seek that information, and I did not speak to John -- about John's happenings here, and I understood that he had taken employment with the Rochester Fire Department.

Q.    And who had told you that?

A.    You know, I think Rochester's chief did, but I don't recall.

Q.    When Rochester's chief said that to

239

you, what did you tell him about John, if anything?

A.        Nothing.  It's not my story to tell.  You know what, John was a good friend of mine.  This whole thing was very painful for all of us.  I still haven't told people.  People say, hey, what happened to Powers?  I don't know.  Go ask John.  New Hampshire's a small place, a small state.  John and I was sitting on the executive board of the state fire chiefs association.  I worked hard to get John appointed.  John had two gubernatorial appointments to state commissions. I had a lot of questions.  What happened to your guy?  You got to ask John.  Well, you got something for us.  I got nothing.  I lost a good guy.  It hurts.

MR. SILVERMAN:  Can we go off the record, Maryellen.

THE COURT REPORTER:  We are going off the record at 3:07 p.m.)

(A break was taken.

3:07 - 3:16 p.m.)

*BY MR. SILVERMAN:*

240

Q.        Mr. Emanuel, I've shared my screen, Plaintiff's Exhibit 13.  Excuse me.  I'm looking at -- this is the town's non-union personnel plan, Section F, General Rules and Regulations, Grounds for Disciplinary Action and Disciplinary Proceedings.  I'm going to scroll down and look at the paragraph at the top of Page 9.  It says "Department heads may take disciplinary actions against an employee for failure to comply with any of the above regulations or for other just cause.  Department heads taking disciplinary action are encouraged to impose a progressive discipline in increasing order of severity as follows."  It says, "verbal reprimand, written reprimand, suspension, demotion, dismissal.  The town recognizes, however, that there are appropriate cases that may warrant the bypassing of progressive discipline due to the degree of the violation.  Disposition of disciplinary matters will normally occur as follows."  I'll note that Paragraph 1 starts with a verbal reprimand.  Paragraph 2 says, "An employee against whom more severe action is being

241

considered is entitled to a hearing before the department head."  Do you see that?

A.    I do.

Q.    Thank you.  Do you know why these procedures were not followed with Mr. Powers's suspension?

MR. MARTIN:  Objection.  You can answer.

A.    I think they were followed with the suspension.  We'd been working on a number of different concerns and issues, and we weren't making any progress, and we weren't having rational conversations.

Q.    Okay.  Well, let me ask you this.  So number 2 says --

A.    Excuse me one second, Greg.  I have a really bad reflection coming off of something in the office here.  I just got to -- sorry, it's lighting me up.  Okay, I'm back.

Q.    Nice work.  Okay.  So Paragraph 1 on Page 1 says, "An immediate supervisor or department head may verbally warn an employee," all right.  And then number 2 says, "An employee

242

against who more severe action is being considered is entitled to a hearing before the department head."  And number 3 starts with "Should a disciplinary action resolve other than a verbal reprimand, an employee will be given written notice within three workdays of the hearing informing him/her of the basis of the charge, the action taken, and the employee's right to appeal the department head's decision to the town administrator."  Do you see that?

A.    I do.

Q.    Okay.  Do you believe that from John's performance improvement plan and suspension that you followed Paragraph 3 here?

A.    That's a good question.  I would say we were outside of the framework of Paragraph 3.

Q.    Okay.  Why was that?

A.    I think we were -- we had a number of competing interests that were related to the health, safety, and survival of members of the fire department and the services we provide to the Town of Durham that put us on a very

243

compressed time frame, that we needed a deputy chief, and I just felt like I had hit a wall as far as our employee or my partner in the prevention bureau was unwilling to work with me, had communication challenges, was unwilling to work with other people, had communication challenges.  When we tried to work on them to discuss them, we couldn't talk about them.  He walked out on me, returned his car, told me he was not fit, and then wanted to fight.  I didn't want to fight.  I wanted to talk to resolve the issue, and I wanted him back at work, and I couldn't get it, I couldn't get there.  And so I guess to answer your question directly --

Q.      Yeah.

A.      -- I issued a directive, the directive was not followed, and he wanted to fight about it.  That was non-compatible with time and the pressure that we were under here at the fire department.  I needed a team player.  I didn't need somebody to fight with me or tell me I was wrong or that they weren't going to do what I asked without reason.

244

Q.      I'm going to focus your attention, Mr. Emanuel, still on Plaintiff's Exhibit 13. This looks like Page 10, Bates stamped at the bottom DEF 592.  Paragraph 8 says, "Grievance procedure for department head."  Do you see that?

A.      I do.

Q.      Okay.  And then it says, "Suspension, dismissal, or disciplinary action against a department head shall be effected only upon the town administrator's presentation to the department head.  The written specification of the reasons therefore," and it goes on.  So would you agree with me that suspension, dismissal, or disciplinary action against a department head gives rise to a grievance procedure under the town policy?

A.      I would.

Q.      I have nothing further, Mr. Emanuel.  Thank you.

A.      Well, Greg, I would like to add that I wasn't the one that was being terminated as the department head, so.

Q.      I understand.

245

A.      Okay.  Just being clear, so.

MR. SILVERMAN:  Sam, any questions?

MR. MARTIN:  No questions here.

MR. SILVERMAN:  Okay.  Thank you all.  Maryellen, thank you.  Do you need any, or can we go off the record.

(Deposition concluded at 3:23 p.m.)

246

**C E R T I F I C A T E**

I, Maryellen Coughlin, CSR/RPR/CRR and notary public in the State of New Hampshire, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes of the Zoom deposition of DAVID F. EMANUEL, who remotely appeared before me, satisfactorily identified himself, and was by me duly sworn, taken at the place and on the date hereinbefore set forth.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

MARYELLEN COUGHLIN, CSR/RPR/CRR

247

- - - - - -

E R R A T A

- - - - - -


PAGE    LINE    CHANGE

____    ____    _____

   REASON:    _____

____    ____    _____

   REASON:    _____

____    ____    _____

   REASON:    _____

____    ____    _____

   REASON:    _____

____    ____    _____

   REASON:    _____

____    ____    _____

   REASON:    _____

____    ____    _____

   REASON:    _____

____    ____    _____

   REASON:    _____

____    ____    _____

   REASON:    _____

248

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby certify that I have read the foregoing pages, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____

WITNESS NAME                              DATE


Subscribed and sworn to before me this

_____ day of _____, 20_____.

My Commission expires: _____


_____

Notary Public